780 So.2d 349 (2001)
STATE of Louisiana
v.
Quincy BROADEN.
No. 99-KA-2124.
Supreme Court of Louisiana.
February 21, 2001.
Rehearing Denied March 30, 2001.
*353 Edward R. Greenlee, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, Beau James Brock, Tracey Ewing, Dale R. Lee, Baton Rouge, Counsel for Respondent.
JAMES C. GULOTTA, Justice Pro Tempore.[*]
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues involve (1) the denial of defendant's challenge for cause during voir dire; (2) defendant's right to be present during chamber discussions of jury matters; (3) admission of other crimes evidence; (4) sufficiency of the evidence; and (5) admission of gruesome pictures.[1]

Facts
In the morning of Saturday, January 13, 1996, Baton Rouge City Detectives Michael McFarland and Frank Wolfanger were called to Canada Street in the Scotlandville area, where a body had been discovered. Preliminary examination indicated that the unarmed victim had sustained a number of small-arms gunshot wounds to the body, as well as a shotgun blast to the head. His left front pants pocket had been pulled inside out indicating the probable motive was robbery. The victim was identified as forty-one-year-old Edward Black. Exploring a larger perimeter of the crime scene, Detective Wolfanger and a uniformed officer discovered a trail of blood on a catwalk or concrete elevated footpath which crossed Scenic Highway and linked two parts of Elmer Avenue. After traversing the crosswalk in a westward direction the investigating officers went to a one-story apartment house at 630 Elmer Avenue where they saw live .9 mm rounds near the driveway of Apartment 5. A Ford LTD was in the driveway and similar live rounds were on the floorboard.
Meanwhile, a second team of investigators consisting of Detectives Willard Keith Bates and Michael Verrett responded to a report of a body at 10186 Avenue B, also in Scotlandville. Upon arrival at the scene, they found the unarmed victim in a vacant lot near an abandoned house. He had sustained a number of small-arms gunshot wounds, and had been shot once in the *354 head by a shotgun, similar to those wounds discovered on the first victim, Black. In the victim's left hand were two one-dollar bills and several quarters. He was identified from his wallet as forty-one-year-old Allan Rutledge, who lived about 200 feet away.
The East Baton Rouge Coroner's Medical Investigator responded to both calls. After arriving on the Avenue B scene, the medical investigator recognized the similarities in the cause and time of the two homicides, thereby believing that the killings were likely related. The investigator reported his observations and Det. Bates noted that the quickest way between the two bodies was by foot across the pedestrian overpass (a highway crossing pedestrian walkway).
The investigating officers again canvassed the apartments, at which time a man who lived there told them that "the kids next door" in Apartment 5 had been firing guns the night before outside in the yard. Some of the shots had been very loud, as though from a large caliber rifle or shotgun. Others sounded like they had been fired from an Uzi-type weapon.
Based on this information the officers proceeded to Apartment 5, where, after knocking and identifying themselves, the sixteen-year-old Eugene Davis opened the door. He stepped out and onto the outside steps, pulling the door shut behind him. Davis stated that he had also heard some shooting around 12:30 a.m., but had no other information to offer. Asked if anyone else was inside, Davis answered affirmatively, but indicated that he did not want police inside. Det. McFarland asked Davis to call the other occupant. Davis opened the door and called, "Lorenzo." A youth lounging on a love seat directly opposite the door, which swung completely open, made eye contact with Det. McFarland and jumped forward while throwing his left hand behind his back. Det. McFarland drew his service weapon, entered the apartment and ordered the youth to stand slowly with his hands away from his body. As the fifteen-year-old Lorenzo Adams stood, a fully loaded .44 magnum revolver was revealed behind him on the love seat. Both teenagers were removed from the apartment. A casual look around the living room of the one-bedroom apartment revealed boxes of ammunition, empty casings, live rounds of various sorts including shotgun shells, .38 wadcutters or dumb-dumb rounds, .44 cartridges and the barrel of what appeared to be a Uzi-type weapon sticking out from under a sofa. Det. McFarland walked through the apartment to assure that no one else was present, then withdrew to obtain a warrant. When attempts at a telephonic warrant failed, the officers secured the apartment and prepared a written search warrant.[2] Behind Apartment 5 was a rusted storage compartment or trailer segment up on blocks. Near one of the blocks was found a towel-wrapped German-made long-barreled six-shot .38 Arminius revolver.
Both teenagers were transported to the detective office, where they gave statements implicating Quincy Broaden and Adams in the murders.
That same evening, detectives obtained an arrest warrant for defendant and executed a search warrant at the Stan Avenue home he shared with his mother and stepfather. Seized were part of a wooden stock, possibly from a shotgun; gray duct tape; and, parts of a base from a shotgun or rifle.[3]
*355 On January 14, defendant surrendered to Det. Bates and was arrested on two counts of first degree murder. Shortly thereafter, he executed a written waiver of his rights and gave a taped confession to Det. Bates detailing the shootings. The tape was played for jurors at trial.
In his statement, defendant acknowledged shooting both victims with a sawedoff shotgun. He identified the other shooter as Lorenzo Adams, who used the.38 revolver. According to defendant, he and Lorenzo were in Apartment 5 in the early hours of Saturday, January 13, when Edward Black knocked, wanting to buy cocaine. He carried money but owed Adams for a previous purchase. Black insisted that the money he had, believed by defendant to be about $40, belonged to someone else, and that he was only a courier. Adams did not believe him and beat him about the face and head. Defendant encouraged Adams to "go on and handle that," which was intended to "buck up" the fifteen-year-old. The three left the apartment and walked over the crosswalk to Canada Street. Lorenzo told defendant that "he was gonna hook him up," i.e., "[j]ust shoot the guy." When they reached a grassy area, defendant told Adams "to go ahead and do what he was gonna do...." Lorenzo emptied the revolver at Black but then panicked at the thought he may survive. Adams kept repeating, "he gotta die he gotta die...." Defendant told him to calm down. He walked over, shot Black with a shotgun, then they "just left and walked back across the catwalk." As they were exiting the crosswalk, Allan Rutledge came up. He was another of Lorenzo's customers looking for drugs. He asked if they had heard the shots. Adams half-panicked, but promised Rutledge drugs. He spoke privately with defendant, telling him that Rutledge had "heard the shot [so] we gotta do something." They walked to a vacant lot, then Adams "some kind of way [] lured the guy over [to the bushes] to tell him he was fixing to give him some dope," but "he was just [psyching] the dude up[,] you know." Thinking he was buying drugs, Rutledge followed Adams past some shrubs. Adams then shot him "a couple of times." Defendant reloaded, and also shot Rutledge with the shotgun. He and Adams then walked back to 630 Elmer. He had taken nothing from the victims, nor had he seen Adams take anything.
Testimony by pathologist Alfredo Suarez established that Edward Black had been struck by four of the .38 bullets; three of which produced non-lethal wounds to the hip, lower back and neck muscles. The fourth, however, struck the right axilla and entered the chest. It transversed the thorax, perforated the right ventricle of the heart, as well as struck the liver. This wound would have been fatal. Yet it was Dr. Suarez's opinion, based in part on the amount of blood the head wound produced, that death was caused by the shotgun blast to the skull. This was a contact wound, done with the victim on the ground. Death was instantaneous.
Dr. Suarez believed that Allan Rutledge was probably dead when hit with the shotgun blast. Rutledge, too, had been struck by small-arms fire. One bullet grazed a calf and entered a thigh, producing a nonserious wound. A second bullet fractured his left arm, entered the chest and severed the carotid and subclavicle arteries, as well as the jugular vein. Rutledge was face down on the ground when the shotgun was fired at close range. Dr. Suarez agreed that each victim would have died from one of the wounds from the .38 revolver.
Other state evidence at trial included testimony from Audrey Johnson, former resident of 630 Elmer Street. Johnson cleaned Apartment 5, where two teenagers *356 lived, and was paid in drugs. She did not know the names of the youths, but called Adams "Red" or "Ren." She knew defendant as a regular visitor to their apartment. Johnson also knew Edward Black from the neighborhood and had seen him several times on the night of his murder, as he made three trips to Apartment 5 for drugs. Late on the evening Black died, Johnson was at home and heard a noise. She opened her front door and walked over to peer past the opened door of Apartment 5. Inside she saw Black on his knees. A teenager closed the door in her face. Soon thereafter she saw defendant and "Red" walking Black on the catwalk towards Canada Street. She observed this from outside the apartment building. She also said she heard a loud "bang." Johnson retreated to her apartment. Minutes later she saw "Red" and the defendant returning, "walking calm, normal ... like nothing was wrong." No guns were visible when she saw Black kneeling in Apartment 5, but she had seen defendant with a sawed-off shotgun earlier on that day and the teenagers always had weapons, more than twenty, she thought, including "pistols... long old rifles," plus the kind that "shoot 13 or 15 times."
Johnson also had seen the second victim, Allan Rutledge, on the night of his death, although she did not know his name. He was a regular customer and on that night he had come to Apartment 5 twice. Johnson was cleaning Apartment 5 when Rutledge arrived the second time. She witnessed his purchase of a dime, or $10, bag of crack cocaine for cash.
Jurors unanimously found defendant guilty of two counts of first degree murder. After trial of the penalty phase, the jury unanimously recommended death, finding three aggravating factors as to the death of Edward Black: (1) that defendant was engaged in the commission or attempted commission of an armed robbery or second degree kidnapping; (2) that defendant knowingly created a risk of death or great bodily harm to more than one person; and (3) that the offense was committed in an especially heinous, atrocious or cruel manner. As to the death of Allan Rutledge, the jury found (1) that defendant was engaged in the perpetration or attempted perpetration of an armed robbery or second degree kidnapping; (2) that defendant knowingly created a risk of death or great bodily harm to more than one person; (3) that the offense was committed in an especially heinous, atrocious or cruel manner; and (4) that this victim was an eyewitness to a crime alleged to have been committed by defendant, or possessed other material evidence against defendant. Defendant filed this appeal.

Challenge for Cause
Defendant contends the trial judge erroneously denied his challenge for cause against prospective juror Michael Lanclos, who was biased in favor of the death penalty. Defendant argues that this juror should have been struck for cause because of his inability to fairly consider a life sentence. The defense excused Lanclos and exhausted its peremptory challenges.
The standard for excluding a potential juror from a capital case based on his opinions regarding capital punishment is whether those views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" State v. Frost, 97-1771, pp. 3-4 (La.12/1/98), 727 So.2d 417, 423, quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The "substantial impairment" standard applies both to those who would vote automatically against capital punishment, i.e., those excludable under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) as clarified by Witt, as well as those who would vote automatically for capital punishment under the factual circumstances of the particular case, i.e., reverse-Witherspoon excludable jurors. State v. Divers, 94-0756, p. 8 n. 5 (La.9/5/96), 681 So.2d 320, 324 n. 5, citing Morgan v. Illinois, 504 U.S. 719, 727-29, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). *357 Such jurors are "not impartial," and cannot "accept the law as given ... by the court." La.Code Crim. Proc. art. 797(2), (4); State v. Maxie, 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35.
The failure to disqualify a venireman unable to consider both life and death as penalties constitutes reversible error. Divers, 94-0756 at pp. 8-13, 681 So.2d at 324-27; Maxie, 93-2158 at p. 23, 653 So.2d at 537-38 (error not to disqualify juror who could listen to mitigating evidence but viewed death as the only appropriate penalty, "[o]nce the crime guilt is established."); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1283-84 (error not to grant challenge for juror who would vote automatically for death if the accused were convicted of the double murders charged); State v. Ross, 623 So.2d 643 (La.1993) (error to deny challenge for juror who felt that the "only penalty" upon conviction of first degree murder was death).
However, answers by potential jurors to questions about mitigating circumstances have been addressed by this court in cases involving the denial of reverseWitherspoon challenges by the defense against jurors regarding their answers. In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, this court approved a death penalty when two jurors, who initially stated that they could not consider the defendant's youth and lack of criminal history as mitigating circumstances, eventually agreed they could consider all factors presented in the penalty phase and could consider a life sentence. In State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, this court approved the denial of a cause challenge when a juror stated that he would consider mitigating evidence, but would require substantial evidence in mitigation in order to be inclined to recommend a life sentence. In State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651, this court upheld the denial of a cause challenge against a juror who believed that the death penalty for an intentional killing "ought to be the law," but agreed to abide by the judge's instructions and to consider both life and death sentences. In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, this court held that cause challenges were properly denied under the "substantial impairment" standard for a juror who would "kind of lean" toward the death penalty, but would entertain a life sentence if the judge instructed him to do so, and for a juror who felt the death penalty was appropriate for the murder of a child, but would be open-minded and would consider all mitigating circumstances. In State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, this court refused to overturn the trial court's denial of a cause challenge to a juror who initially stated that he would not consider the statutory mitigating circumstance of intoxication, even if so instructed by the judge, but ultimately agreed he would consider it and give appropriate weight "depending on the case."
We are mindful also that trial judges are accorded wide discretion when ruling on cause challenges. A refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence. Howard, 98-0064 at pp. 7-10, 751 So.2d at 795-97; Robertson, 630 So.2d at 1281.
Here, Lanclos was questioned as part of a four-person panel. As part of its questioning, the prosecutor discussed the law of principals and advised that the under-aged teenager co-perpetrator could not be subject to the death penalty, different for an adult. Lanclos believed that both offenders "should have the same penalty." Further, when asked about whether two offenders may receive different penalties for the same offense under the law and whether Lanclos would have any trouble with this, his response was "the law is the *358 law." Further questioning in this regard revealed:
A. I mean, if the law says the 15 is, you know, excused from it and the other one is not, then he's not.
Q. Now, it's not excused from it.
A. Well, not excused from it but it's on the books that, you know
Q. He can still be held accountable.
A. Right.
Q. He just cannot be put to death.
A. Right. Judged differently. Right.
Under further questioning by the defense counsel and after a full explanation of aggravating and mitigating circumstances, Lanclos reiterated that he would be willing to consider mitigating circumstances. In an at-length questioning on consideration of the evidence, Lanclos responded:
Q. Does that seem the way it should be to you?
A. I think so.
Q. Mr. Lanclos, do you feel like each and every member of the jury is entitled to have his views respected regardless of whether or not it'sfor example
A. Yeah, as long as what they believe is in view of the evidence. I mean, as long as they're not, you know, ignoring some evidence thator maybe missing it, you know.
Q. An assuming that they remain willing to listen further and discuss further?
A. Yeah.
He stated that he could consider statutory mitigating evidence as well as consider the death penalty solely in relation to this defendant.
The state moved on to specific intent and how it could be formed a split second before action was taken. While Lanclos seemed confused between premeditated murder and one in which specific intent to kill is formed instantaneously, he thought that "[murder is] still murder" and that "the penalty should be the same for both cases." The state asked him if he "understood that the death penalty is not automatic and that no case will mandate death." Lanclos's response was "sure." He further stated that he could consider both aggravating and mitigating evidence and return a life sentence if warranted.
Under defense questioning, Lanclos again indicated a willingness to decide and consider relevant mitigating circumstances. Counsel then asked if Lanclos's views on the death penalty had changed in the past decade. The juror thought not, and he understood that only certain first degree murder cases carry the possibility of capital punishment. Counsel inquired if Lanclos thought that
the death penalty should be a possibility in all cases of murder, first degree murder, second degree murder?
A. Should be a possibility? Yeah.
Q. Do you think that when someone has been found guilty of unlawfully killing another person that the appropriate penalty is to execute that offender?
A. Yeah.
Q. Is there anything that has influenced that viewand I'm not arguingI'm not challenging your view but I'm wondering what influences have helped you form that view of the death penalty.
* * *
A. Well, if you're getting [at] what I wrote down in the questionnaire, I believe it's in God's word, you know, an eye for an eye and a tooth for a tooth. And I don't believe that our God changes. I believe that's a penalty that's always been instituted by Him and I think we should carry that on because he never changes. We shouldn't change either.
Defense counsel moved on, asking for another juror's opinion on capital punishment and if he thought that differing views on the topic should be represented on the jury. Counsel put the same question to *359 Lanclos, who replied that it was only natural to expect differing views among jurors.
Elsewhere Lanclos said that he could hold the state to its burden and could acquit if guilt was not proved beyond a reasonable doubt. On another question about minority-view jurors not surrendering their opinions while still being open to discussion, Lanclos felt that jurors' opinions were entitled to respect, "as long as what they believe is in view of the evidence." He thought that respect was due, "as long as they're not, you know, ignoring some evidenceor maybe missing it, you know."
With the panelists removed from the courtroom, defense counsel challenged Lanclos for cause, citing the juror's responses "regarding the biblical underpinnings" of his belief that "every death would require a death." The state opposed the challenge, believing that the biblical passage was merely a quote coming in the context of a discussion about the difference between someone who plans a murder and one who decides in a split second to kill. The state also noted that the juror had expressed willingness to consider mitigating circumstances, to return a life sentence, and had understood that death was not automatic. The trial court denied the challenge, to which the defense objected.
We find no error in the denial of this cause challenge. In capital cases, the trial judge makes personal observations of potential jurors during the entire voir dire. A reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct voir dire by microscopic dissection of the transcript in search of magic words or phrases that automatically signify the juror's disqualification. State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205. The totality of Lanclos' colloquy states that he would be able to consider both mitigating and aggravating circumstances in deciding the death penalty.[4] When directly asked if he understood that the death penalty was not automatic and that no case mandated death, he stated "sure," and stated affirmatively that he could return a life sentence if warranted. This court has held that prospective jurors who expressly agree to consider both life and death sentences and to consider any mitigating evidence are not properly excused for cause. State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396.
The voir dire of Lanclos resembles that conducted in State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, in that the state did not rehabilitate the juror after the defense elicited testimony indicative of his commitment to vote for the death penalty. In our case, because Lanclos expressed on more than one occasion the ability to consider mitigating evidence before deciding on a sentence, he was not unwilling to consider a life sentence and would not automatically vote for the death penalty under the facts of this case. Id. at p. 1, 724 So.2d at 1290 (on reh'g). We conclude that there was no abuse of discretion by the trial judge when he denied defense counsel's challenge for cause of Lanclos.

Defendant's Right to be Present
Defendant complains that he was denied his right to be present at all critical stages of trial when he was not permitted to join chamber discussions, held to determine whether one or more jurors remained qualified to serve. Before trial, juror Karen Marino told the judge that she had learned that the defendant had attempted to murder someone by stabbing him while in jail awaiting trial. She admitted passing on details to one other juror. The remaining jurors were examined, both in the courtroom and in chambers, but defendant was not present at the in chambers *360 examination. Defendant contends that a mistrial should have been granted.
A criminal defendant charged with a felony has a right to be present "[a]t the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror...." La. Code Crim. Proc. art. 831A(3); State v. Hampton, 99-2605, pp. 1-2 (La.5/28/99), 737 So.2d 699, 700. The rule is broader than an accused's due process right to be present at all stages of trial when his absence might frustrate the fairness of the proceeding. Id., citing United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).
Yet the provisions of Article 831 are not absolute. In addition, an accused may waive his presence by voluntary absence, La.Code Crim. Proc. art. 832, or by not objecting to his absence from an Article 831A(3) hearing, as required under the general contemporaneous objection rule to preserve the matter. La.Code Crim. Proc. art. 841; State v. Taylor, 93-2201, pp. 4-7 (La.2/28/96), 669 So.2d 364, 367-69.
The focus of the in chambers examination in the instant case was how the juror gained the information and to which other juror or jurors the one juror had conveyed this information. The judge became concerned about whether the jurors had been improperly influenced.
During this examination the state inquired if the defense "object[ed] in any kind of way to the defendant not being present...." The assistant district attorneys believed that this was a "jury matter," not requiring an accused's presence. Defense counsel replied that it was "not necessary to have him present, it's not necessary to waive his presence."
While the court itself was uncertain if Marino had made the statements claimed, but assuming so, the relevant inquiry was whether anyone had heard. A five-hour investigation had found no one who had, or at least admitted that he or she had heard. Accordingly, a mistrial and stay were denied. The court replaced Marino with an alternate, swore in the panel and ordered it sequestered for the night.
In this case, defense counsel was likely mistaken in believing that neither his client's presence nor a waiver was required for the "subsequent proceedings for the discharge of ... a juror[.]" La.Code Crim. art. 831A(3). In any event, the defendant's interests were fully represented. One or both defense attorneys attended all proceedings and participated throughout. While no request for the accused's presence in chambers was made, there was no objection to his absence. The circumstances support a conclusion that the defense acquiesced in the accused's exclusion from the chambers proceedings. With no objection, the matter is not preserved. La.Code Crim. Proc. art. 841; Taylor, 93-2201 at pp. 4-7, 669 So.2d at 367-69.
In addition, the trial court correctly denied a mistrial.[5] The five-hour investigation, which included multiple interviews and an examination under oath of every juror and alternate, turned up nothing. Everyone denied having heard Marino's comments or remarks about the case. *361 The trial court therefore had a strong factual basis from which to conclude that, whatever Marino intended or did say, no one heard her. The defense has not shown otherwise.

Admission of Other Crimes Evidence
Defendant complains that the trial court denied a mistrial motion, made after the state elicited other crimes evidence from a witness in violation of La.Code Crim. Proc. art. 770(2). Defendant argues that this was a clear attempt to discredit the defendant by implicating him in the drug dealings of roommates Adams and Davis.
The state called Audrey Johnson, a resident of 630 Elmer Street, who cleaned Apartment 5 for Lorenzo Adams and Eugene Davis. On cross-examination, the defense established that Johnson was paid in drugs for her services, as well as that both victims had been to Apartment 5 to purchase drugs several times in the hours before their deaths. On re-direct, the state asked Johnson if she had received drugs from anyone else in that apartment. She replied that she had, naming the defendant.
There was no objection to the initial question or follow-up queries. The state completed its re-direct, Johnson was told she could step down, and jurors were removed for the lunch break. It was only then that the defense moved for a mistrial, arguing that the state solicited other crimes evidence, grounds for a mandatory mistrial under La.Code Crim. Proc. art. 770(2). The state agreed that it elicited the testimony, but only after the defense opened the door about the identity of those from whom Johnson received drugs. The state noted the lack of objection, and the misleading of jurors into thinking only the teenagers gave Johnson drugs. The trial court denied the mistrial without reasons.
We find that the objection was not timely. Alternatively, if we were to conclude that the objection was indeed timely, we are led to conclude that defense questioning of Johnson was broad enough to have opened the door for state queries on who else may have given Johnson drugs. If not sufficiently broad enough, however, and the deliberately-elicited testimony by the state violated La.Code Crim. Proc. art. 770(2), the admission was harmless. See State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. Furthermore, prejudice assessments and rulings on mistrial motions fall to the sound discretion of the trial court. As the prejudice was slight, if it indeed existed, denial of a mistrial did not constitute reversible error. State v. Connolly, 96-1680, p. 23 (La.7/1/97), 700 So.2d 810, 824.

Insufficiency of the Evidence
Defendant argues that the evidence is insufficient to support conviction for two counts of first degree murder. The state's theory was that defendant had specific intent to kill Edward Black and was a principal to the killing of Allan Rutledge, that the killings occurred during the commission or attempted commission of armed robbery, second degree kidnapping, or when Broaden had specific intent to kill or inflict great bodily harm on more than one person. La.Rev.Stat. 14:30A(1), (3).
It is undisputed that defendant shot both victims in the head with a sawed-off shotgun but defendant concedes specific intent to kill only as to Black. Even then, he argues that the state failed to prove that Black was killed during an armed robbery or while defendant committed or was a principal to second degree kidnapping, as necessary for conviction under La.Rev.Stat. 14:30A(1). Nor, defendant argues, did the state prove that he specifically intended to kill or inflict great bodily harm upon more than one person, as is required under La.Rev.Stat. 14:30A(3).
With regard to Black's murder, in support of claims that no armed robbery or kidnapping occurred, the defense relies heavily on details provided by defendant in his confession. According to the defense, *362 the second victim (Rutledge) was not present at the time of Black's death, thus his death could not have been contemplated at the time Black was killed; nor was Rutledge killed in a single, consecutive course of conduct as would be necessary for conviction under La.Rev.Stat. 14:30A(3).
Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.Rev.Stat. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. Maxie, 93-2158, p. 11 (La.4/10/95), 653 So.2d 526, 532. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. State v. Tassin, 536 So.2d 402, 411 (La. 1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989).
Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force...." La.Rev.Stat. 14:64. Second degree kidnapping, as urged in this case, is defined as the "enticing or persuading of any person to go from one place to another," La.Rev.Stat. 14:44.1B(2), wherein the victim is "[p]hysically injured," "[i]mprisoned or kidnapped when the offender is armed with a dangerous weapon...." La.Rev.Stat. 14:44.1A(3), (5). A specific intent killing during the commission or attempted commission of an armed robbery or second degree kidnapping is a first degree murder. La.Rev.Stat. 14:30A(1). A specific intent killing "[w]hen the offender has the specific intent to kill or to inflict great bodily harm upon more than one person," also is first degree murder. La.Rev.Stat. 14:30A(3). This intent has been defined by this court as requiring an offender to contemplate and actually cause the death of one person and the risk of death or great bodily harm to at least one other person by a series of acts during a single criminal episode or transaction. State v. Baldwin, 96-1660, pp. 8-9 (La.12/12/97), 705 So.2d 1076, 1080.
The standard on review in insufficiency of evidence claims is whether a rational juror, viewing the evidence in a light most favorable to the state, could have found all elements of the charged offense(s) proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Undoubtedly, placing a shotgun to the heads of individuals and pulling the trigger supports findings of specific intent to kill beyond a reasonable doubt. While both victims received gunshot wounds from the .38 revolver fired by Adams which would have ultimately proven fatal, medical evidence established that Black was killed by the shotgun blast fired by the defendant, but that Rutledge was probably dead when the defendant fired the shotgun into his skull. Even if defendant did not personally kill Rutledge, his actions and the circumstances reflect that he acquiesced fully in the use of deadly force and intended the prohibited criminal consequences to follow from Adams's act in shooting Rutledge. State v. Brooks, 505 So.2d 714, 717-19 (La.1987).
In connection with the insufficiency claim, the jurors were entitled to find from details in defendant's confession and testimony by Johnson, that Black arrived at Apartment 5 with money to purchase drugs and that he was shot to death and robbed shortly thereafter by defendant and Adams. In his confession, defendant relates that Black arrived with about $40, which he insisted was not his own, but belonged to someone else who wanted to buy drugs. Adams became angry because Black already owed him for drugs, and he accused Black of lying. Defendant urged Adams to resolve matters, "bucking him up" with statements such as, "well go on and handle that then, handle that thing." Adams decided to leave the apartment, *363 telling Black, "come on man we're gonna walk over there with you...." As they walked toward Black's home, Adams let defendant know that he "was gonna hook him up," by which defendant understood Adams was going to "[j]ust shoot the guy." Once they reached a grassy area on the Canada Street side of the catwalk, defendant urged Adams to "go ahead" and "what you gonna do[?]" Thus prodded, Adams emptied his revolver at Black. Defendant walked over and without checking to see if the victim were still alive, shot Black in the head with his shotgun. Defendant and Adams carried extra shells, and were able to reload without returning to Apartment 5.
Although defendant denied taking money from Black and said he had no knowledge if Adams had, jurors could reasonably conclude otherwise. The jury could have reasonably found that when defendant approached Black close enough to put the shotgun barrel against his skull, he also turned the victim's front pants pocket inside out and removed the cash which he thought "[l]ook[ed] like it might have been about $40.00 or so[.]" Equally jurors could very well have found that defendant fully joined Adams's removal of the cash from Black's pocket. La.Rev.Stat. 14:24. The confrontation between Adams and Black in Apartment 5 seen by Johnson, the condition of the body with a front pants pocket turned inside out, the fact that defendant was able to estimate the amount of money Black was carrying, all support a conclusion that defendant and Adams killed and then robbed Black. The evidence supported a specific intent homicide occurring during an armed robbery. It was therefore sufficient to support conviction for first degree murder committed during an enumerated felony.
As to Rutledge, jurors were furnished evidence from Johnson that he was another of Adams's customers who had made several purchases at Apartment 5 that evening. Her testimony lends credence to portions of defendant's confession that when he and Adams were returning via the catwalk after Black's murder, Rutledge approached them to ask if they had heard the recent gunfire. Defendant's confession has Adams panicking at the thought of Rutledge becoming "a rat or something" remarking that "we gotta do something." As before, defendant encouraged Adams, "man do what you feel you got to do." The only evidence of luring or enticing Rutledge from one place to another is found in defendant's confession. He recounted that he, Adams, and Rutledge were walking down Avenue B when Adams stepped into some bushes in a vacant lot and "lured the guy over there," telling Rutledge "he was fixing to give him some dope [but out of sight.]" Rutledge followed, and Adams began firing. Defendant, according to his confession, also "shot the guy."
Independent evidence corroborated some of defendant's account. For example, ballistics confirmed that the same .38 revolver was used in both murders. The two murders were also linked by the close-contact shotgun blasts to the victims' heads. Lab results revealed the presence of cocaine in Rutledge's blood, confirming his use of illegal drugs. Other details embedded in defendant's confession were corroborated by evidence at the scene. For example, Rutledge's body was found in some bushes in an empty field by an abandoned house in close proximity to the first murder scene. This matched the route defendant said they took and the area to which Adams allegedly had lured Rutledge. The victim also had a few dollar bills and some quarters clenched in his left hand, as though to purchase something when he was shot.
The testimony and physical evidence, together with reasonable inferences arising from the circumstantial evidence, support findings that defendant aided and abetted Adams while they were armed with dangerous weapons, in "enticing or persuading [Rutledge]" to accompany them to a deserted spot on Avenue B, in order to *364 murder Rutledge. This conduct defines a second degree kidnapping. La.Rev.Stat. 14:44.1A(3), (5); B(2). A killing during the commission or attempted commission of a second degree kidnapping constitutes first degree murder. La.Rev.Stat. 14:30A(1). Jurors were entitled to find that the evidence, when viewed in the light most favorable to the state, established all elements of a specific intent homicide occurring during an enumerated felony beyond a reasonable doubt.

Admission of Gruesome Photographs
Defendant complains of the admission of three gruesome photographs. Defendant argues that as both victims would have died from bullets fired by Adams, the probative value of this evidence is slight and was introduced solely to inflame jurors and incite them to convict based on the pictures. Objections were raised before trial.
The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; State v. Martin, 93-0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. Koon, 96-1208 at p. 34, 704 So.2d at 776, citing State v. Perry, 502 So.2d 543, 558-59 (La. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
We agree that the photographs are indeed gruesome. This court regularly sees claims of "gruesome" photographs in capital cases, but has reversed only once on these grounds in any case. State v. Morris, 245 La. 175, 157 So.2d 728 (1963) (gratuitous introduction of "gruesome and ghastly" photographs depicting the progress of an autopsy in an "increasing grotesque and revolting" manner constituted reversible error when the defendant admitted that he killed the victim and contested only his state of mind). Admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." Martin, 93-0285 at pp. 14-15, 645 So.2d at 198. Cf., State v. Wessinger, 98-1234, pp 16-17 (La.5/28/99), 736 So.2d 162, 179 (photographic evidence "will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict defendant absent other sufficient evidence.")
We do not find any reason to treat photographic evidence differently than any other evidence, which is admissible if relevant and more probative than prejudicial. La.Code Evid. art. 403. At any rate, we find that the admission of the disputed photographs in this case was gratuitous. The pathologist could have given verbatim testimony illustrated by other, less graphic photos. While the state is certainly entitled to the moral force of its evidence, that evidence should enlighten rather than bludgeon the jury. The photographs taken at the crime scenes were sufficient to demonstrate the cause of death as well as the location of the gunshot wounds. However, we do not find reversible error.

Capital Sentence Review
Pursuant to La.Code Crim. Proc. art. 905.9 and Louisiana Supreme Court Rule 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination the court considers whether the jury imposed the sentence under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender.
The Capital Sentence Investigation Report indicates that defendant is an African-American male, born December 7, *365 1973, who was twenty-two years old at the time of the murders. He has never been married and has no dependents. He left school in the ninth grade at the age of eighteen.
Defendant's early years were stable and unremarkable. He apparently had a good home, caring family, and a full-time mother who remarried in 1978. Defendant began falling behind in the third or fourth grade. He was put in special education, diagnosed with a severe though unspecified learning disability. A series of social promotions followed. His difficulties began when he reached the age of eleven or twelve. He lost interest in school, skipped school regularly, and began drinking. Matters continued to deteriorate with the onset of adolescence. He had begun experimenting with marijuana. At school he tested in the bottom seven percent nationally in science and reading, and the bottom one percent in language. He could no longer be promoted socially. At the age of eighteen he failed ninth grade. Defendant began to have brushes with the law, which went from minor to major. He tried suicide and saw the ties to his family disintegrate.
Defendant has a long history of offenses involving violence against the person. As a juvenile, defendant was charged with simple battery on May 29, 1989, for hitting a fourteen-year old girl at school, for which he was counseled and warned. In November 1989 he was charged with simple battery, resulting in an Informal Adjustment Agreement which expired July 31, 1991. On May 31, 1990, he was charged with attempted murder for shooting the victim with a .38 pistol; the charge was ultimately dismissed.
As an adult, defendant was charged in December 1991 with aggravated assault and illegal use of a weapon. He pled to the aggravated assault and was given a ninety-day term at parish prison, suspended, and placed on one year probation. He was charged with second degree murder on September 23, 1993; the charge was later dismissed after the grand jury returned a no true bill. In November 1994 he was charged with stalking. He pled to aggravated assault and was sentenced to one hundred and fifty days in parish prison. He was paroled October 1, 1995. In January 1996, he was charged with two counts of first degree murder, the subject of the present proceedings. While in jail awaiting this trial, defendant was charged with simple battery in March 1996, and sentenced to six months at parish prison; and, with attempted second degree murder in February 1998, a case which is still pending. Defendant's 1994 and 1996 convictions were introduced at the penalty phase.

1. Passion, Prejudice or Other Arbitrary Factors

The record does not provide any indicia of passion, prejudice, or arbitrariness. Both the defendant and the victims were African American, and nothing in the record suggests that race was an issue at trial.

2. Aggravating Circumstances

Statutory aggravating circumstances urged and proven by the state were, as to Black, that the murder was committed during the commission or attempted commission of an armed robbery. La.Code Crim. Proc. art. 905.4A(1). The evidence established at trial, primarily through defendant's own statement, supports the conclusion that Black was killed during the commission or attempted commission of an armed robbery. Statutory aggravating circumstances alleged and shown by the state as to Rutledge were that the murder occurred during the commission or attempted commission of second degree kidnapping. La.Code Crim. Proc. art. 905.4A(1). The state also established beyond a reasonable doubt that, as to both victims, the defendant knowingly created a risk of death or great bodily harm to more than one person. La.Code Crim. Proc. art. 905.4A(4).
*366 As to the other aggravating circumstances, we find that the state failed to establish either that the murders were committed in an especially heinous, atrocious or cruel manner, or that Rutledge was an eyewitness to a crime allegedly committed by the defendant or was in possession of material evidence against him. However, the failure of one or more statutory aggravating circumstances does not invalidate a death penalty if another statutory aggravating circumstance is supported by the record, as long as the evidence offered in support of the arguably unproved aggravating circumstances did not inject an arbitrary factor into the proceedings. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Connolly, 96-1680, pp. 17-18 (La.7/1/97), 700 So.2d 810, 822. Here, the other aggravating circumstances were clearly supported by the record, and the evidence introduced to support basis for the failed statutory aggravating factors did not inject an arbitrary factor into the proceedings.
The state also established beyond a reasonable doubt that, as to both victims, the defendant knowingly created a risk of death or great bodily harm to more than one person. La.Code Crim. Proc. art. 905.4A(4).
Here, aggravating circumstances were clearly supported by the record, and the evidence introduced to support a basis for the failed statutory aggravating factors did not inject an arbitrary factor into the proceedings.

3. Proportionality Review

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Welcome, 458 So.2d 1235 (La.1983). Nevertheless, this court has set aside only one death penalty as disproportionately excessive under the post 1976 statutes, finding in that one case a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
Jurors in the Nineteenth Judicial District have, since 1976, returned the death penalty on approximately eighteen occasions. A review of the capital verdicts from this district does not suggest that defendant received a disproportionately harsh sentence. See e.g. State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Miller, 99-0192, p. 8 (La.9/6/00), 776 So.2d 396. Moreover, a statewide review of cases reflects that jurors often return the death penalty in a variety of cases involving multiple deaths or when a defendant creates the risk of death or great harm to more than one person. State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076; State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364; State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272; State v. Deboue, 552 So.2d 355 (La.1989).

Decree
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either, (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. 15:567B, immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in *367 which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev. Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] James C. Gulotta, Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] Seized from Apartment 5 under a search warrant executed that same day were the .44 Magnum revolver from the love seat; spent casings; live .38 wadcutter or dumb-dumb rounds; a semi-automatic .9mm Luger; $96 in cash; .270 rifle rounds; and, numerous types of .12 gauge shotgun shells. From the side and back yards police recovered numerous live rounds, as well as spent casings from various types of ammunition.
[3] Analysis later confirmed that the wadcutter or dumb-dumb rounds removed from the victims were fired from the .38 Arminius revolver. There were no fingerprints on the weapon or cartridges. The shotgun shell used on Black was 12 gauge, lead, # 6 bird-shot. The shell used on Rutledge was 12-gauge, lead, # 8 bird-shot. Neither shell could be identified by brand. The wooden stock seized from the defendant's home could not be positively identified as from a shotgun. The shotgun itself was never recovered.
[4] Contrast Lanclos's responses with those of one prospective juror who thought that anyone who kills "need[s] the death penalty." In that instance, the trial court properly excused the juror for cause.
[5] Mistrial is a drastic remedy and is warranted under La.Code Crim. Proc. art. 770 only when a remark or comment referencing an accused's commission of other crimes results in prejudice to his substantial rights sufficient to undermine the fairness of trial. Assessing prejudice and deciding whether to grant or deny a mistrial lies in the sound discretion of the trial court. State v. Connolly, 96-1680, p. 23 (La.7/1/97), 700 So.2d 810, 824. Even though Article 770(2) is couched in mandatory terms (a "mistrial shall be ordered ...."), the admission of other crimes evidence is subject to harmless error analysis. State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. When the source of comments about other crimes is a potential juror, prejudice is unlikely and a mistrial not merited when the remaining jurors "were not exposed to the factual basis for the [objectionable] juror's possible partiality [and knowledge of an accused's background.]" State v. Simmons, 443 So.2d 512, 517-18 (La.1983).