JOY COSSICH LOBRANO, Judge.
|,The State filed a bill of information charging defendant, Rivers Jacques, with one count of attempted second degree murder, a violation of La. R.S. 14:(27)30.1, for the shooting of Joseph Tyler, and one count of possession of a firearm by a convicted felón, a violation of La. R.S. 14:95.x.[1] Following a trial, a jury found the defendant guilty of aggravated battery, a violation of La. R.S. 14:34. The State filed a multiple offender bill of information, charging defendant with being a third felony offender. Following a multiple offender hearing, the trial court adjudicated defendant to be a third felony offender and sentenced him to twelve years at hard labor in the Department of Corrections. Defendant appealed his conviction and sentence.
The State began trial by introducing a 911 tape into evidence. Tyler testified that he was shot on June 27, 2009. On that day, his aunt and he threw a 70’s party at a hall in the Hollygrove area. After the party ended, between 1:00 and 2:00 a.m., Tyler and his cousin, Dwayne Montgomery, went to pick up another cousin, Doty, from her job at Harrah’s casino. When they arrived at the casino, they parked on S. Peters Street to wait for Doty. Tyler was dressed as Run DMC for the 12party and was wearing black pants, an Addidas shirt, a white cango bucket cap and big glasses.
Tyler was standing on the S. Peters Street sidewalk when he heard gunshots. He saw a flash out of the corner of his right eye. There was traffic and a car. Scared, Tyler ran toward the casino. As he ran, Tyler felt blood running down his leg; he had been hit in the upper right thigh. Tyler tried to stop the bleeding by tying his shirt around his thigh. Montgomery ran over and exclaimed, “Oh you’re hit.” Tyler recalled Montgomery calling someone, and then he passed out. He regained conscience in an ambulance and recalled the emergency room visit at University Hospital.
The day after the shooting, the police interviewed Tyler in the hospital. He denied telling the police that he knew the shooter. Tyler claimed that he did not know why he was shot. He testified that Montgomery was the only person with him in the car when they drove up to the casino and that Montgomery was unarmed. Tyler admitted to a 2008 conviction for carrying a concealed weapon, but denied being armed when he was shot.
On cross examination, Tyler repeated that Montgomery did not have a gun in the car. He also testified that he was drinking alcoholic Daiqúiris at the party from approximately 9:00 p.m. He denied knowing a Belile Jacques, and he testified that he attended Live Oak School. He denied playing basketball with Belile Jacques at Clay Park. However, he admitted participating in athletics at Clay Park.
At approximately 3:00 a.m. on June 27, 2009, Lieutenant William Short, a New Orleans Police officer, finished working a detail at Generations Hall. He changed *754 clothes, got into Mend Jonathon Wrangof-ski’s truck, and drove down S. RPeters toward Canal Street. When they arrived at the light at Canal Street, a white car and a black Nissan truck were in front of them,- stopped for a red light. A man got out of the white car, crossed the street, leaned against a lamp post, and stared at the black truck. The light turned green, but no one moved. Wrangofski was about to honk his horn when Lt. Short saw muzzle flashes and a chrome gun. The shots came from the driver of the black truck. The man leaning against the lamp post did not move.
The black truck drove off, and Lt. Short and Wrangofski followed it. Lieutenant Short called 911. They followed the black truck, turning onto St. Louis Street. The black truck “got jammed up trying to cross Bourbon.” After crossing Bourbon Street, the driver in the black truck appeared to notice he was being followed because he sped up. He turned right onto Dauphine Street and left onto St. Peter Street. At St. Peter and Rampart Streets, Lt. Short and Wrangofski saw police cars that “picked up the chase.” Since Lt. Short was off duty and did not have sirens, they decided to stop. Lieutenant Short called the command desk, informed where he was, and gave his number for follow up information. He subsequently gave a statement to Detective Jana Thompson, the lead investigator on the case.
At some time between 3:00 and 4:00 a.m., Officer Brett Graybill responded to a dispatch for a shooting on Canal Street. The dispatch described a dark colored pickup truck, possibly a Nissan Titan. As he drove down N. Rampart St., he heard a high revving engine behind him right after he had crossed St. Peter Street. Officer Graybill saw through the rearview mirror a dark colored Nissan Titan crossing N. Rampart on St. Peter. He backed his vehicle up, turned onto St. Peter St., and pursued the truck down St. Peter St., heading north. He turned the lights Don and tried to stop the truck. The truck stopped between St. Peter St. and the entrance to the Municipal Auditorium.
Officer Graybill drew his weapon and ordered the defendant, who was the driver of the Nissan Titan black truck, to place his hands outside of his truck. The defendant complied. Officer Graybill then called for backup.
When backup arrived, defendant was ordered out of the truck, and he was handcuffed. He appeared to be confused. Once defendant had been secured, the officers approached the truck and found Kyr-an Nelson passed out in the passenger seat. Nelson, who smelled of alcohol, was awakened and handcuffed. No weapons were recovered from Nelson or the defendant.
Officer Graybill then spoke briefly to Det. Thompson describing the stop. He did not search the truck, preferring to wait for detectives.
Nelson was placed in Officer Graybill’s car, and defendant was placed in another police ear. Officer Graybill transported Nelson to the crime scene on Canal Street so detectives could interview Nelson.
Dr. Ted Sikorski, an emergency medicine physician at University Hospital, testified that he treated Tyler for a single gunshot wound to his right thigh.
Det. Thompson testified that she arrived at the crime scene at the intersection of S. Peters and Canal Streets at approximately 3:15 a.m. on June 27, 2009. The scene was chaotic — there were several police officers and an ambulance. Crime scene tape was being placed, and a pool of blood was on the ground. Tyler was already in the ambulance.
*755 Three bullet casings were recovered from the ground some fifteen to twenty feet from the intersection of S. Peters and Canal Streets. The state introduced pictures of the crime scene during Det. Thompson’s testimony. The scene was | ^canvassed, but no weapons were found. Several witnesses stated they saw a black truck, some providing more specific descriptions than others. The descriptions of what happened coincided with the evidence recovered.
When Det. Thompson saw footage of the crime scene taken by casino cameras, she observed a black male stumble into the street and collapse at the bottom of the steps in front of the casino. She also saw a black truck fleeing. The jury saw this video footage. During her investigation, Det. Thompson found nothing indicating that Tyler had discarded a weapon.
Defendant and Nelson were detained at approximately 8:45 a.m. and taken to the crime scene while Det. Thompson, who was in radio contact with the arresting officers, was still there. Defendant told Det. Thompson that he was going to pick up his cousin at Basin and St. Peter Streets and had planned to proceed to Club Hush. Detective Thompson ended the interview because she believed he was lying. She also wanted to gather more information to see if she could find more witnesses before continuing the interview with defendant.
Det. Thompson and the crime lab team went to the scene where defendant’s truck was — at Basin and St. Peter Streets — at approximately 5:50 or 6:00 a.m. Photographs were taken of defendant’s truck, a black Nissan Titan with a Texas license plate that matched the license witnesses gave to the 911 operator. A shell casing was recovered from the doorframe of the driver’s side door. Another shell casing was found next to a bottle in the truck. In all, four shell casings were recovered.
Det. Thompson just searched the area around the driver’s seat, until she could get a search warrant. After obtaining the warrant, she searched the rest of Rthe truck. No gun was recovered. Detective Thompson explained that the arresting officers had failed to secure the truck properly.
On cross examination, when asked if gunshot residue kits taken from the defendant and Nelson tested negative for gunshot residue, Det. Thompson replied that she requested the test results, but was never provided with them. When asked to verify that Defense Exhibit 4 stated, “Rivers Jacques and Kyran Nelson’s hands tested negative for no presence of gunpowder residue of GSR,” Det. Thompson answered, “correct.”
Detective Thompson affirmed that when she interviewed Tyler, he told her that he had seen the driver’s face as the Titan black truck passed him and that he was frowning. However, Tyler also said he could not see the perpetrator’s face and was not able to identify the defendant or Nelson in a photographic lineup. In her report, Det. Thompson also noted that Tyler had informed that he may have known the driver.
On re-cross examination, it was revealed that, according to Det. Thompson’s report, Tyler told her that after seeing the driver frown, “[t]he drivers’ side door suddenly opened and he, the victim, heard gunshots and observed the flashes coming from the gun.”
Meredith Costa, a firearms expert with the New Orleans Police Department Crime Lab, testified that she tested the shell casings recovered from both the crime scenes at Canal and S. Peters Streets, and the recovered truck at St. Peters and Ba *756 sin Streets, and concluded they were all fired from the same weapon. The State introduced the casings into evidence as Exhibits 27 and 28.
Teresa Martin (“Martin”), defendant’s girlfriend at the time of the incident, testified pursuant to a subpoena after the State granted her immunity. She testified 17that at approximately 3:30 a.m. on June 27, 2009, she was awakened by a call from defendant’s sister, Janika. During their conversation, Janika learned that defendant had been involved in a shooting outside the casino. Martin subsequently drove from her home in Gentilly to the casino. When she arrived, she saw yellow tape and cones on the ground. She left the scene and headed back home. Martin also called Janika to confirm that a shooting had occurred. During that conversation, she learned that defendant had been arrested near Armstrong Park.
Martin then received a call from defendant’s brother, Brennon, who told her the location of defendant’s truck. He also told her to go to the intersection of Orleans and Claiborne Avenues. Brennon transported Belile, defendant’s nephew and Janika’s son, there, and Belile entered Martin’s car. They drove to defendant’s truck. It was still dark when they arrived at the truck sometime between 3:30 and 4:45 a.m. They drove around the block to ensure no police were around before pulling up behind the truck. Belile entered the truck through the rear passenger door. He searched the truck for seven or eight minutes before exiting with a black and silver gun. After retrieving the gun, Martin dropped Belile off at the corner of Orleans and Claiborne Avenues. She testified that the gun belonged to defendant and she had seen it in his possession during a visit to her home.
Martin returned home, called Janika, and informed her that the weapon had been removed from the truck. Though Martin and defendant had not been speaking prior to the shooting, she received several calls from defendant in jail within the next twenty-four hours. In one of the conversations, she told him, “I don’t know if you know but I got that thing,” referring to the gun. Martin said defendant was pleased to learn that she had successfully removed the gun from his truck. She testified that defendant told her that as he was being pulled over by the |spolice, he had attempted to call “Dreke” to have him tell her to remove the gun from the truck.
Knowing the conversations were being recorded, instead of telling defendant that Belile had been with her, she said that her thirteen year old son had been with her. When confronted by the prosecutor with a recording of her conversation, Martin admitted that it was not her son, but Belile who had been with her. Belile was murdered four months after the shooting. Martin did not know what happened to the gun.
The State introduced defendant’s recorded jailhouse conversations through Don Hancock, a telephone supervisor for the Orleans Parish Sheriffs office. The recordings were played for the jury.
The record presents no errors patent.
Under Louisiana jurisprudence, when a defendant presents issues of alleged errors at trial and overall sufficiency of the evidence under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), for review, the insufficiency of the evidence claim is addressed first. State v. Mercantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55. Thus, we now address the second assignment of error wherein Defendant asserts the evidence in the record is insufficient evidence to support his conviction of aggravated battery.
In evaluating whether evidence is constitutionally sufficient to support a *757 conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Captville, 448 So.2d 676, 678 (La.1984). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to |9support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d at 1309-10; State v. Strother, 2009-2357, p. 10 (La.10/22/10), 49 So.3d 372, 378. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319,1324 (La.1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817, 820 (La.1987). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty. Captville, supra. On review, this Court does not determine Imwhether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. State v. Smith, 2006-313, p. 5 (La.App. 4 Cir. 11/21/06), 946 So.2d 218, 221. Rather, this Court, when evaluating the evidence in the light most favorable to the prosecution, must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found guilt beyond a reasonable doubt under Jackson. Id.
When the issue is the perpetrator’s identity, the State must negate any reasonable possibility of misidentification. State v. Neal, 2000-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658. A single witness’s identification is sufficient to support a conviction. Id.
“A fact finder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.” State v. Huckabay, 2000-1082, p. 33 (La.App. 4 Cir.2/6/02), 809 So.2d 1093,1111.
The record in this case includes Lt. Short’s testimony that he saw shots coming from the driver side of a black Nissan Truck at the corner of S. Peters and Canal Streets. A friend who was driving and he followed the truck until they saw police cars “pick[ ] up the chase” at the intersection of St. Peter and N. Rampart Streets. During the pursuit, Lt. *758 Short called 911 and spoke to the operator as they followed the truck.
Officer Graybill testified that he was responding to a dispatch describing a dark colored pickup truck — possibly a Titan— when he heard a loud engine sound behind him after he crossed St. Peter St., while driving down N. Rampart St. Officer Gray-bill pursued the truck driving north on St. Peter St. and stopped him near the entrance to the Municipal Auditorium. Officer Graybill’s testimony confirms Lt. Short’s testimony that the police “picked up the chase” at the |nintersection of N. Rampart and St. Peter Streets. Defendant and Nelson were the only occupants in the truck at that time, and they were arrested. Officer Graybill testified that Nelson was passed out and had to be wakened. Defendant was the driver.
Detective Thompson testified that the truck defendant was stopped in was a Black Nissan Titan with a Texas license, and that the license matched the description given to the 911 operator. Ms. Costa, the firearms expert, testified that the markings on three casings recovered from the crime scene at Canal and S. Peters Streets matched the markings on a casing recovered from the truck defendant was driving. Given the testimony of Lt. Short, Officer Graybill, and Ms. Costa, it was reasonable for a jury to determine beyond a reasonable doubt that Tyler was shot by the driver of the black Nissan Titan truck, who turned out to be defendant. Defendant argues that Lt. Short’s testimony about the passenger exiting the vehicle and yelling at Wrangofski and him presents a reasonable possibility of misidentifi-cation of him as the shooter. He reasons that since Nelson was passed out, the passenger who yelled at Lt. Short and Wran-gofski may have been a third person and may be the shooter. This hypothesis is not reasonable. Lt. Short testified that he pursued the truck until the police took over the chase. He did not testify that the man yelling at him, nor anyone else, exited the truck. It would be reasonable for the jury to conclude that Nelson did the yelling and then passed out. The conclusion that defendant was the shooter is further confirmed by Lt. Short’s testimony that the shots came from the driver of the truck. Thus, we find that the evidence supports the jury’s determination beyond a reasonable doubt that defendant shot Tyler.
|12Next, we address the first assignment of error, wherein defendant asserts that the trial court erred by not granting a mistrial, which he requested after the prosecutor, during the closing argument, referred to his committing another crime. Specifically, the prosecutor stated:
And, then the words out of his own mouth. The words out of Rivers Jacques himself, within 12 hours of getting arrested, trying to cover up and trying to get destroyed the additional physical evidence that would link him to that case.
Defendant contends the mistrial was warranted under La.C.Cr.P. art. 770(2), which provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
[[Image here]]
*759 An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A trial court has broad discretion in controlling the scope of closing arguments. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036. Prosecutors have “‘wide latitude in choosing closing argument tactics.’ ” State v. Jones, 2010-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833, quoting State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183. “[W]hen evidence of other crimes is admissible for any purpose, the State may | isargue that evidence to the jury.” State v. Andrews, 527 So.2d 411, 414 (La.App. 4th Cir.1988).
“Mistrial is a drastic remedy and is warranted under La. [C.Cr.P.] art. 770 only when a remark or comment referencing an accused’s commission of other crimes results in prejudice to his substantial rights sufficient to undermine the fairness of trial.” State v. Broaden, 99-2124, p. 16 (La.2/21/01), 780 So.2d 349, 360, n. 5, cert. denied, 534 U.S. 884,122 S.Ct. 92,151 L.Ed.2d 135 (2001).
In this case, the aforementioned statement by the prosecutor during closing argument is an inference based on defendant’s recorded statement to Martin that, while being pulled over, he tried to “get a hold of Dreke” to tell him to tell her to remove the gun from his car. The prosecutor’s statement was not a reference to another crime committed by defendant “to which evidence is not admissible.” La. C.Cr.P. art. 770(2). Rather, the statement refers to conduct by defendant that constituted an integral part of the act or transaction that was the subject of the trial proceeding. Because the statement refers to conduct admissible under La. C.E. art. 404(B)(1)[2] and La.C.Cr.P. art. 720[3], the prosecutor could argue it to the jury. A mistrial was not warranted. This assignment of error is without merit.
| uAccordingly, for the above reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED.

. On March 27, 2013, the State entered a nolle prosequi on the count of possession of a firearm by a convicted felon.

. La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

. La.C.Cr.P. art. 720 provides that evidence "which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding or other crimes for which the accused was previously convicted” shall be admissible without prior notice to the defendant.