# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 21-19


## STATE OF LOUISIANA IN THE INTEREST OF C.C.H.



**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. J-3335
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

**********

## D. KENT SAVOIE
## JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, Billy Howard Ezell, and D. Kent Savoie, Judges.


**AFFIRMED IN PART; REVERSED IN PART;**
**AND REMANDED WITH INSTRUCTIONS.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **C.C.H.**

**Hon. James Patrick Lemoine**
**District Attorney**
**Thirty-Fifth Judicial District Court**
**Post Office Box 309**
**Colfax, Louisiana 71417-0309**
**(318) 627-3205**
**COUNSEL FOR APPELLEE:**
        **State  of Louisiana**

**SAVOIE, Judge.**

On July 21, 2020, the State filed a petition seeking to declare Juvenile C.C.H. delinquent for committing first degree rape of A.M.F., a child under the age of thirteen, a violation of La.R.S. 14:42.[1] The commission date range listed in the petition was January 1, 2016, to January 1, 2018. On August 12, 2020, a denial of the charge was entered, and on October 7, 2020, the matter was before the court for a pre-adjudication conference. The adjudication hearing was set for November 4, 2020. On October 29, 2020, on joint motion of the parties, the adjudication proceeding was continued to December 2, 2020. The adjudication proceeding was held as scheduled, and after hearing the evidence, the judge found that the State met its burden of proof and adjudicated the Juvenile delinquent. Shortly thereafter, the judge moved on to disposition. Whether he ordered that the Juvenile be placed in secure custody until he reaches the age of twenty-one is a disputed issue discussed below. The court indicated it was providing the Juvenile with a copy of article setting forth the sex offender registration requirements. The Juvenile is before this court appealing both his adjudication and disposition.

## ERRORS PATENT

Although the Louisiana Children's Code is silent as to whether a juvenile criminal proceeding is entitled to an error patent review, this court has found that such a review is mandated by La.Ch.Code art. 104 and La.Code Crim.P. art. 920. *See State in the Interest of J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081. After reviewing the record, we find several issues with the record.

---

[1]Initials of the Juvenile and the victim are being used pursuant to Uniform Rules—Courts of Appeal, Rule 5-2 and La.R.S. 46:1844(W).

First, the minutes do not indicate that the Juvenile was present for the answer hearing.[2] According to the minutes, the attorney for the State was present, the attorney for the Juvenile was present, the attorney for the Juvenile's brother (co-defendant) was present, and the Juvenile's mother and father were present. The purpose of a juvenile's presence at the answer hearing is so the trial court can advise him of the allegations against him and his rights in accordance with La.Ch.Code art. 855. After being so advised, the Juvenile must answer the allegations against him as provided for in La.Ch.Code art. 856:

> A. After the child has been advised pursuant to Article 855, the court shall inquire how the child responds. The child may:
>
> (1) Deny the allegations of the petition, in which case the court shall set the matter for an adjudication hearing.
>
> (2) Deny the allegations of the petition and contest the request for adjudication due to insanity as defined in this Title, in which case the court shall not adjudicate the child without a hearing, at which time the child has the burden of establishing this defense.
>
> (3) Admit the allegations of the petition, in which case the court shall further inquire to determine whether there is a factual basis for adjudication. If so, the court may then adjudicate the child delinquent.
>
> (4) With the court's permission, enter a response of nolo contendere. If, in its discretion, the court accepts such response, the court shall further inquire to determine whether there is a factual basis for adjudication, and it may then adjudicate the child delinquent.
>
> B. A child shall plead when called upon to answer. If he stands mute, refuses to plead, or pleads evasively, a denial of the petition shall be entered of record.

La.Ch.Code art. 856. According to the minutes, the attorneys for both of the Juveniles entered denials.

---

[2] The minutes also fail to reflect that the Juvenile was present for the hearing at which the adjudication and disposition were held; however, it is clear from the transcript that the Juvenile was present.

We found no articles in the Children's Code specifically addressing a juvenile's absence from the answer hearing. Louisiana Children's Code Article 104 states the following regarding the proper procedure when the Children's Code is silent:

> Where procedures are not provided in this Code, or otherwise by law, the court shall proceed in accordance with:
>
> (1) The Code of Criminal Procedure in a delinquency proceeding and in a criminal trial of an adult.
>
> (2) The Code of Civil Procedure in all other matters.

La.Ch.Code art. 104.

The presence of an adult defendant at arraignment is mandated by La.Code Crim.P. art. 831. However, the supreme court has stated that the provisions of La.Code Crim.P. art. 831 are not absolute and may be waived by the lack of a contemporaneous objection. *State v. Broaden*, 99-2124, p. 15 (La. 2/21/01), 780 So.2d 349, 360, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001). Furthermore, La.Code Crim.P. art. 555 provides:

> Any irregularity in the arraignment, including a failure to read the indictment, is waived if the defendant pleads to the indictment without objecting thereto. A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.

La.Code Crim.P. art. 555.

Since the Juvenile in the present case entered a denial to the allegations against him through his attorney and proceeded to the adjudication without objecting to his absence from the answer hearing, we find that any error is waived.

Next, the Juvenile did not answer the allegations of the petition within fifteen days as required by La.Ch.Code art. 854:

A. If the petition is filed prior to or during the hearing to determine continued custody, the court may order the child to answer the petition upon completion of the hearing. If not so ordered and the child is continued in custody, he shall be ordered to appear to answer the petition within five days after the filing of the petition.

B. In all other cases, the child shall be ordered to appear to answer the petition within fifteen days after the filing of the petition.

C. For good cause, the court may extend such period.

It appears the Juveniles in the present case were not in custody since the minutes of the answer hearing state that the Juveniles were to have no contact with the victim for two years, were to have no contact with minor children in the home in which they reside, and were to enroll in Spring Garden High School in Piedmont, Alabama. Thus, the answer hearing should have been held within fifteen days of the filing of the petition. In this case, the petition was filed on July 21, 2020, and the answer hearing did not occur until August 12, 2020. According to the method of computation provided for in La.Ch.Code art. 114, the answer hearing took place one week beyond the fifteen-day period. This court has held, however, that the remedy for the untimely answer hearing is release of the juvenile from custody, a remedy which is rendered moot once adjudication has already taken place. *State in Interest of L.D.*, 14-01, pp. 10-11 (La.App. 3 Cir. 5/7/14), 139 So.3d 679, 685, *affirmed*, 14-1080 (La. 10/15/14), 149 So.3d 763. Accordingly, the untimely answer hearing in this case has been rendered moot by the Juvenile's adjudication.

Additionally, the adjudication hearing was not held within the time period set forth in La.Code Crim.P. art. 877. The time for holding an adjudication hearing is provided for as follows:

A. When the child is charged with a crime of violence as defined in R.S. 14:2(B) and the child is continued in custody pursuant

4

to Chapter 5 of this Title, the adjudication hearing shall commence within sixty days of the appearance to answer the petition. In all other cases, if the child is continued in custody pursuant to Chapter 5 of this Title, the adjudication hearing shall commence within thirty days of the appearance to answer the petition.

B. If the child is not continued in custody, the adjudication hearing shall commence within ninety days of the appearance to answer the petition.

C. If the hearing has not been commenced timely, upon motion of the child, the court shall release a child continued in custody and shall dismiss the petition.

D. For good cause, the court may extend such period.

La.Ch.Code art. 877.

Since the present Juvenile was not in custody, the adjudication hearing should have been held within ninety days of the Juvenile's appearance to answer the petition. The Juvenile appeared to answer the petition on August 12, 2020; thus, the adjudication hearing should have occurred by November 10, 2020. According to the minutes of the answer hearing, the adjudication was set for November 4, 2020. On October 29, 2020, a joint motion for continuance was filed, requesting the adjudication be continued until December 2, 2020. The trial court granted the continuance and set the adjudication for December 2, 2020. Since the Juvenile joined in the request for a continuance and, therefore, did not object to the setting of the hearing outside of the time period, the time period was extended for good cause, and no error patent should be recognized. *See State in the Interest of K.K.*, 14-479, p. 5 (La.App. 3 Cir. 12/17/14), 153 So.3d 1280, 1283 n.4 and *State in the Interest of S.D.,* 13-1028 (La.App. 3 Cir. 2/12/14) (unpublished opinion).[3]

---

[3]This case is cited at 2014 WL 576265.

## ASSIGNMENT OF ERROR NUMBER ONE

The Juvenile contends that the evidence introduced at the adjudication hearing was insufficient to prove beyond a reasonable doubt that he committed the first-degree rape of the victim, A.M.F. Additionally, if the evidence is found sufficient by this court, the Juvenile contends there was insufficient evidence to prove that he was fourteen years of age or older at the time of the commission of the offense which was required to invoke both a more stringent penalty as well as lifetime sex offender notification requirements. This issue will be addressed in a separate section below.

Rape is defined in La.R.S. 14:41 in pertinent part as follows:

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

The applicable first degree rape provision is that the rape is deemed to be without the lawful consent of the victim because the victim is under the age of thirteen years. La.R.S. 14:42(A)(4).

The Juvenile and his twin brother co-defendant, R.J.H., were tried together but represented by different attorneys at the December 2, 2020 adjudication hearing. At the hearing, Detective Ryan James of the Grant Parish Sheriff's Office testified that he began his investigation in December 2019, when the victim's mother reported to him that her daughter told her that the Juvenile and his twin brother (R.J.H.) had "held her down on the bed and . . . described. . . contact with the anus region with a penis." According to the victim's mother, the incidents began occurring in June of 2017, which, by Detective James' calculation, meant

6

the Juveniles were fourteen to fifteen years old.[4]  The victim was under the age of twelve.  At the time, the Juveniles were living on Grey's Creek Road in Dry Prong in Grant Parish.  After hearing the mother's allegations, Detective James set up an interview for the victim at the local Advocacy Center.  According to Detective James, the victim was interviewed by Annelise Eaglin, and during the interview she "allocated [sic] to at least two (2) times that she was uh, anal sex had been performed on her."  The Juveniles were arrested near Piedmont, Alabama where they were living at the time.

On cross-examination, Detective James testified that the victim said that the Juveniles put a blanket over her and although there was sexual contact, it was not forcible.  She said this occurred at least two times.  He acknowledged that it sounded like it occurred twice, but he acknowledged that it could have been once.

A.M.F., the victim, testified that she was born September 25, 2009.  She testified that she, her sister, her brothers, her mom, and sometimes her dad, used to go over to Ms. Toni Giarrusso's house a lot.   Living there with Ms. Giarrusso were her six children, including the twin boys, and another person whom A.M.F. believed to be Ms. Giarrusso's husband.  Years after they occurred, A.M.F. told her mother about the incidents that happened while she was at Ms. Giarrusso's house.  When asked why it took her so long to tell her mother, A.M.F. responded that she "guess[ed] [she] kind of thought like it was [her] fault."  When A.M.F. told her mother, she said her mother jumped up out of bed, went outside, and called Ms. Giarrusso.

---

[4] Detective Ryan testified that the Juveniles were sixteen years old when they were arrested, and he confirmed that their date of birth was February 25, 2003.

At the hearing, A.M.F. testified that the incidents occurred while her mother was distracted or when she went to the store with Ms. Giarrusso. The boys, who A.M.F. identified as C.C.H. and R.J.H.[5] "would ask her to play Lego's or something like that. . . and when we went into the room it was just [her] and one of them or both of them." They would "take [her] into the room, lock the door, put [her] over one of the beds that was next - - right next to the closet, um, with a blanket over to [her] waist, but before that they would pull [her] pants and underwear down, and lay [her] down in the bed." A.M.F. described the room and said that the lock on the door handle was a "twist lock." She testified that it was either C.C.H. or R.J.H. or both who took part in the first incident. She was confused about which of the two boys was in the room the first time this happened.

A.M.F. said the boys pushed her, putting her stomach on the bed with her legs off the bed and her feet touching the floor. The blanket placed over her prevented her from seeing them. A.M.F. said they would then take their "no no" and "stick it in [her] butt" and she confirmed that this would happen almost immediately after she was put on the bed. A.M.F. clarified that a "no no" is what boys "pee out of," and she had seen her brother's once when he was urinating. When asked how she knew it was their "no no," she replied, "[b]ecause . . . it felt slimy" and she said they had nothing around them or on the floor that looked or felt slimy. She confirmed that she did not see their "no no's," and she did not see whether their pants were up or down. When asked why she thought their pants were down, she said, "[t]hey had nothing slimy in the room, and I couldn't see anything, but I felt something. . . . and it felt slimy." A.M.F. was asked where the "slimy" was, and she said, "it like went in my butt hole. . . [u]p my butt." A.M.F.

---

[5] A.M.F. referred to R.J.H. as "Trey."

confirmed that the Juveniles said nothing during these incidents, and she never heard any noise. When asked how it felt, she said, "[i]t felt like something just done over and over again . . . like something jamming me over and over again into my butt." She said she remained quiet and still while this was going on.

A.M.F. testified that the Juveniles stopped when her siblings banged on the door "or [the incident] would just take minutes or so." She confirmed that she never heard the boys' clothes moving. To stand up again, A.M.F. said she would take the blanket off and "they would pull [her] out." She testified the Juveniles would "blame the whole thing on [her]," because they would say, "A.M.F., pull your pants up, something like that." When she got up, she did not see anything on the floor. According to A.M.F. this happened more than once, and although she could not recall how many times, she knew it occurred over a period of years. The same thing happened every time. When asked if there was always just one boy in the room, she responded, "yes, ma'am, it was [sic] always go in a pattern as I remember it, it [would] go in a pattern, [C.C.H.] then [R.J.H.], [C.C.H.] then [R.J.H.], [C.C.H.] then [R.J.H.]." Only one Juvenile would be in the room at a time, and they would alternate. Each time, she felt "[j]amming over and over again." According to A.M.F., she did not really know how many times this happened, but she knew it was "over a period of years," and she knew it was more than once. A.M.F. was never told not to tell anyone, and once the Juveniles moved out of town, A.M.F. told her mother what happened. According to A.M.F., she was six years old when the incidents began, and she thought they continued until she was eight. At the time of the adjudication hearing, she was eleven.

On cross-examination, C.C.H.'s attorney asked A.M.F. why she did not tell the female detective about the repeated "jamming." She said the detective did not

ask her about that. She also said in her statement that the boys' "no no's" were cold. A.M.F. was asked how many others were present in the house when these incidents occurred. She said there were six others in the house, but she never called out to them. A.M.F. also testified that she did not experience pain during these incidents.

On cross-examination by R.J.H's attorney, A.M.F. explained that the first few times, the Juveniles got her into the room by asking her to play Legos with them. Other times, they put her in front of them "and [would] act like security guards or something," prohibiting her from going back. She clarified that the first time this happened, both boys were in the room, but after that, it was "one [1] boy after the other." She saw which boy it was each time before the blanket was put over her head. Although she was "not sure" how many times this happened, she confirmed that it occurred more than twenty times. She explained that she did not tell her mother until the boys moved because she was afraid her mother might do something to the boys, and on re-direct examination, she said she did not want her mother to get into trouble.

Annelise Eaglin, a forensic interviewer from the Children's Advocacy Center, testified that A.M.F. was very outgoing and "bubbly" at the beginning of her interview, but she became reserved and quiet when she was questioned about the incidents. Then, at the end of the interview, A.M.F. became talkative and animated again. Ms. Eaglin explained that it is not unusual for a child's interview to vary from their testimony in court.

The video of the interview was played at the adjudication hearing. In it, A.M.F. provided a few more details than she did in her trial testimony. When she was asked about the boys pulling down their pants and underwear, she said she

"knew . . . they had to because . . . if they were doin' that to me then I know it's something that they wouldn't do to anyone else and they wouldn't want me to see . . . what's going on so they just put a blanket over me." She said she felt slimy things in her butt. She thought it was something else, but she knew it had to be their "thing." She thought it was something like slime, and it was sticky. She then said she knew it wasn't slime because "how can you get it out after a while?" so she knew it had to be their "thing" or "no no," which she later clarified was a penis. She described it as really cold and slimy. She said the first time this happened, C.C.H. took her in the room and locked the door. He pulled down both his pants and underwear and hers, and he started sticking his penis in her butt. When asked how she knew it was his penis, she said, "[b]ecause I heard him pull down his pants and his underwear." A.M.F. was asked, "I know you said uh that [C.C.H.] pulled down his pants and put his penis in your butt, um did [R.J.H.] ever do that? Okay, tell me about that." A.M.F. responded, "[R.J.H.] would do the same thing [C.C.H.] would do and well it was just the different thing was him and nothing else would ever change." She said thinks she told her mom about these incidents in either October or November.

She said she knows this happened more than once, and the boys moved away to Georgia probably last year. She said the last time this happened to her was in 2016 or 2017.

The Juveniles' mother, Toni Hoffpauir Giarrusso, testified that she has lived in Alabama for two years. Prior to that, she lived in Spring Garden, Alabama, for six months. Before that, she lived in Dry Prong on Gray's Creek Road, where the family lived for a little over a year. During the time she and her family lived there, her family and the victim's family visited almost daily. In the house on Gray's

11

Creek Road, the twin boys, whose birthdays are February 25, 2003, shared a room with three of their brothers. She confirmed they had a box of Lego's in their room. Ms. Giarrusso first testified there were no locks on any of the doors but then confirmed that there were locks on the doors, but they did not work. She confirmed that A.M.F.'s mother called her, but she said no details were discussed and they did not have a "full blown conversation." Ms. Giarrusso told A.M.F.'s mother that she did not believe her and hung up on her.

Based on the foregoing evidence, the court found that the State met its burden of proof beyond a reasonable doubt that the Juveniles committed first-degree rape by having anal intercourse with the victim, who was nine or younger at the time. The judge's findings, in pertinent part, were as follows:

> There - - the - - the primary testimony that has been presented in this case comes from the victim, and the victim has testified both personally in court today, we also have as evidence the interview that was conducted um, at the Advocacy interview.
>
> A.M.F. testified today as an eleven (11) year old girl, she testified that between the ages of six (6) and eight (8) that the defendants, [C.C.H.] and who he [sic] identified as [T.], being [R.M.H.], that on numerous occasions they would lure her into their room under the (indistinct) of playing Legos or something else, that they would lock the door, that they would bend her over their bed, the bed near the closet, not the bed near the door, that they would put a blanket over her - - from her waist to her head, pull her pants and panties down, and they would stick their no no in her anus.
>
> Today she testified that there was ramming. Asked when they would stop, well they would stop when Jacob or Annelise [sic] would knock on the door, and then they would tell her to pull her pants up to make it her fault so that whoever was knocking at the door would understand that the reason her pants were down was because she took her pants down.
>
> Mr. Wilson has noted some concerns of her testimony. She described their no no's as being slimy. Mr. Wilson explained that no no's aren't slimy until after, not before, they're also not cold.

There's been no evidence today to describe how no no's get slimy or whether they're hot or cold by experts so we're going to have to use common sense.

Mr. Wilson, I do believe there's a way that no no's on fifteen (15) and sixteen (16) year old boys get slimy, it's called lubricant, and not all those lubricants are heated, some of them may be cold. That might also explain some other things. Might also explain why it didn't hurt.

Question is who do you believe? Do you believe a the testimony of a ten (10) year girl, because that's how old she was when she disclosed this information.

First question we asked is why did you wait? Because she was afraid her mom was going to hurt them. Well why does she think her mom is going to hurt these young men for something that's her fault? Is it possible that a nine (9) year girl who has seen only one (1) penis before might be confused about what was happening, and whether it was her fault or not?

I think that is possible. I think it is possible that a nine (9) year old girl who doesn't know anything about sex might feel something, not a Pinnocchio effect, but guilt for being involved in something that she shouldn't have been involved in. Fortunately, children that age know when something is wrong, and I think she knew that whatever was slimy in her anus was wrong.

Those were the only inconsistencies I heard. Cold and slimy otherwise, as Mr. Smith indicated, she was very believable, and I think that her credible testimony is sufficient.

The Court finds that the State has met it's [sic] burden of proof beyond a reasonable doubt, that the defendants has committed the offense of 1st degree rape that being having anal intercourse with a victim who at the time of the alleged acts, of the proven acts, were under the age of thirteen (13), in fact, at the time she was nine (9) or younger. Those acts having occurred at the home of [Toni] on 1125 Gray's Creek Road in Dry Prong, Louisiana right down the road from Brother Sherman's church which is in Grant Parish where they lived for over a year.

On appeal, the Juvenile cites the following as the applicable standard of

review for a challenge to the sufficiency of the evidence in a juvenile case:

In evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational

13

trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The *Jackson* standard of review is applicable in juvenile delinquency cases. *State in the Interest of T.E.*, 2000–1810, p. 4 (La.App. 4 Cir. 4/11/01), 787 So.2d 414, 417.

In addition, La. Const. art. V, § 10(B) mandates that an appellate court review both law and facts when reviewing juvenile adjudications. "While delinquency proceedings may in many ways implicate criminal proceedings, even mimicking them, they are nonetheless civil in nature." *State in the Interest of D.R.*, 2010–0405, p. 5 (La.App. 4 Cir. 10/13/10), 50 So.3d 927, 930. (Emphasis in the original.). Therefore, as in the review of civil cases, a factual finding made by a trial court in a juvenile adjudication may not be disturbed by an appellate court unless the record evidence as a whole does not furnish a basis for it, or it is clearly wrong. *See State in the Interest of Batiste*, 367 So.2d 784 (La.1979); *State ex rel. E.D.C.*, 39,892 (La.App. 2 Cir. 5/11/05), 903 So.2d 571; *State ex rel. T.W.*, 2009–532 (La.App. 3 Cir. 10/7/09), 21 So.3d 465; and *State in the Interest of S.S.*, 557 So.2d 407 (La.App. 4 Cir.1990). In sum, we apply the "clearly wrong-manifest error" standard of review to determine whether there is sufficient evidence to satisfy the standard of proof beyond a reasonable doubt.

*State in the Interest of A.H.*, 11-1152, pp. 4-5 (La.App. 4 Cir. 12/21/11), 80 So.3d 1203, 1206-07.

Applying the "clearly wrong-manifest error" standard of review, the Juvenile contends that the evidence was insufficient to prove he raped A.M.F., noting the following:

-The judge stated there was no expert testimony presented to describe how no no's get slimy or whether they are hot or cold, so he used common sense to find that lubricant was most likely used. A.M.F. testified that she saw nothing in the Juvenile's hands, there was nothing beside him, and she saw nothing on the floor. Additionally, A.M.F. testified she never heard the Juvenile moving his clothing, making it unlikely that he was applying lubricant.

-The Juvenile's mother testified they lived in Dry Prong for a little over a year, then moved to Spring Garden, Alabama, where they lived for about six months before moving to Piedmont, Alabama, where they had lived for two years. The family did not live in Dry Prong for two years, so the incidents could not have spanned a two-year period as testified to by A.M.F.

-A.M.F. testified to only one specific occurrence and could not provide any specific information concerning other occurrences, other than to say they were exactly the same.

-A.M.F.'s testimony varied from the statements made during the forensic interview.

> -At times, she testified she was confused and unsure of what exactly happened, and she would then answer a similar question without any indication she was confused.

> -A.M.F. assumed C.C.H. used his penis though she did not see him unclothed or hear him undress and she did not see anything around them that looked or felt slimy. A.M.F. stated in her interview that she thought something like slime was used. A.M.F. felt no pain and offered no indication of a mess or need for cleaning afterwards.

-The judge noted A.M.F. was eleven years old at the time of trial, and ten years old when she reported the abuse, acknowledging that she testified that the abuse occurred when she was six to eight years old. A.M.F. indicated that the last incident was probably in 2016 or 2017. The judge did not question A.M.F.'s statement that she did not report the abuse earlier because she was worried about what her mother would do to the boys, so she waited until they moved. However, A.M.F. did not report the abuse for years after the boys had left Louisiana.

The Juvenile contends this court has the jurisdiction and the duty to review the weight of the evidence, and applying this standard, he contends the evidence was insufficient to prove that he had anal intercourse with A.M.F.

In *State in Interest of C.D.*, 11-1701, pp. 4-10 (La. 7/2/12), 93 So.3d 1272, 1275-78, the Louisiana Supreme Court discussed the applicable standard of review in juvenile cases as follows:

> In vacating the juvenile court's delinquency adjudication of defendant, the court of appeal noted the state's case rested entirely on the uncorroborated testimony of Officer Dobard, which, in the court's view, "[did] not negate every reasonable probability of misidentification, especially given C.D.'s different clothing [at the time of arrest], the lack of drugs on his person, and his lack of connection to this part of the neighborhood and the 2033 Wagner residence." *C.D.*, 11-0121 at 7, 69 So.3d at 1223. Although

15

acknowledging that "eye witness testimony alone can be sufficient evidence to satisfy the State's burden," the court of appeal observed that "Louisiana jurisprudence has recognized that there are instances in which 'numerous eccentricities, unusual coincidences and lack of corroboration' make such testimony so unreliable that even a reasonably pro-prosecution rational fact finder must have a reasonable doubt about the identification." *Id.*, 11-0121 at 7-8, 69 So.3d at 1223 (quoting *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988)). In concluding the present case offered one such instance, the court of appeal took into account the failure of the state to produce any evidence in support of its hypothesis that defendant could have changed clothes and slipped out of the back of 2033 Wagner undetected by police surveillance even as he crossed the street and stood in front of the residence where Dobard found him after the officer returned to the scene with the warrant team. *Id.*, 11-0121 at 8, 69 So.3d at 1224. The court of appeal further noted the police had made no attempt to bring Mary Charles back to the scene to identify the person who sold her the heroin, an omission that spoke "volumes" about the state's failure to corroborate Dobard's eyewitness identification of defendant. *Id.*, 11-0121 at 9, 69 So.3d at 1224. Finally, the court of appeal emphasized that juvenile delinquency proceedings are essentially civil in nature, *State in the Interest of Batiste*, 367 So.2d 784, 789 (La.1979), and that review of a delinquency adjudication is therefore subject not only to the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also to a broader standard by which an appellate court reviews both the facts and law, specifically, the trial court's factual findings, for clear or manifest error, "to determine whether there is sufficient evidence to satisfy the standard of proof beyond a reasonable doubt." *C.D.*, 11–0121, p. 6, 69 So.3d at 1223 (citation omitted). Given the loose ends in the state's case, the court of appeal concluded "the trial court was clearly wrong in determining that the state had proven the identification of C.D. beyond a reasonable doubt." *Id.*, 11-0121 at 10-11, 69 So.3d at 1224-25.

However, as a matter of due process, the court of appeal erred in losing sight of the basic principle on review that the rational fact finder test of *Jackson v. Virginia*, "does not permit a reviewing court to substitute its own appreciation of the evidence for that of the [fact finder]." *State v. Lubrano*, 563 So.2d 847, 850 (La.1990) (citing *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983)). Thus, an appellate court should ordinarily not assume "the role of the fact-finder to weigh the respective credibilities of the witnesses" and thereby "second guess the credibility determinations of the trier of fact beyond . . . sufficiency evaluations under the *Jackson* standard of review." *Graffagnino*, 436 So.2d at 563.

As the court of appeal acknowledged in the present case, "[e]yewitness testimony alone is usually sufficient in the mill run of

cases." *Mussall*, 523 So.2d at 1311. *Mussall* stands as the single, sui generis, exception to that rule in this Court's jurisprudence, and it is distinguished by its truly bizarre facts. *Id.*, 523 So.2d at 1312 ("With the addition of the eccentricities of [the victim's] story any rational trier of fact must take a dim view of the state's case even in its most favorable light: a frugal young man who saves a nest egg on minimum wage, responds to a call out of the blue from a virtual stranger about a boat owned by the caller's friend by liquidating his $4,000 savings, borrowing $2,000 more from his sister at 18 ½%, and rushing off to meet the caller with $6,000 in his pocket, without first inspecting the boat or talking to the owner of the boat about price; and an armed robber who calls in advance of the crime to renew acquaintances with his  victim, uses his correct name and leaves his home phone number so that he cannot fail to be identified.").

The decision in *Mussall* has no bearing on the outcome in the present case because there was nothing "eccentric" or "unusual" about the testimony of Officer Dobard, an experienced narcotics officer who conducted a routine drug investigation in a routine manner, a "mill run case" in which the police acted on a tip from a confidential informant, established a surveillance of the suspect location, and observed what then happened in an attempt to verify the information. *See, e.g., State v. Williams*, 250 La. 64, 193 So.2d 787 (1967); *State v. Robertson*, 02–0156 (La.App. 4th Cir.2/12/03), 840 So.2d 631; *State v. Lawrence*, 02–0363 (La.App. 4th Cir.5/8/02), 817 So.2d 1216; *State v. Bryant*, 98–1115 (La.App. 4th Cir.8/4/99), 744 So.2d 108. Officer Dobard would not give his location or exact distance from 2033 Wagner Street but he did state he was "not 200 feet" away and was using a pair of binoculars. He then observed defendant conducting two or possibly three transactions, including the exchange with Mary Charles. The officer thus had more than an ample opportunity to view his suspect, an important factor bearing on the reliability of eyewitness identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (reliability is the lynchpin of the admissibility of identification testimony and is determined by several factors, foremost of which is the opportunity to view).

In addition, while the state failed to produce "surveillance video, maps, or the like," *C.D.*, 11-0121 at 8, 69 So.3d at 1224, to show the various entrance and exit points of 2033 Wagner Street, Dobard testified explicitly the residence had front and back approaches. His surveillance point had afforded him a view of the front porch and the officer assigned to watch the house while Dobard went for his police cruiser to accompany the warrant team presumably continued the surveillance from Dobard's vantage point. That the officer may have missed defendant's departure, perhaps through the back exit, and subsequent appearance across the street wearing different clothing than worn by the suspected heroin dealer, did not negate the reasonable probability Dobard made a reliable

identification, based his hours-long observation of the seller through binoculars, because Dobard remembered what defendant looked like, notwithstanding he had changed outfits. *Kyles v. Whitley*, 514 U.S. 419, 466, 115 S.Ct. 1555, 1581, 131 L.Ed.2d 490 (1995) (Scalia, J., dissenting) ("Facial features are *the primary means* by which human beings recognize one another. That is why . . . the Lone Ranger wears a mask instead of a poncho . . . and . . . why a criminal defense lawyer who seeks to destroy an identifying witness by asking 'You admit that you saw only the killer's face?' will be laughed out of the courtroom."). Given the circumstances under which Dobard conducted the surveillance and viewed the heroin trafficker, the failure of the police to keep Mary Charles on the scene for two or more hours until the surveillance wrapped up and the warrant for 2033 Wagner Street was executed may have reflected no more than a rational assessment by officers on the scene that Dobard was in a position to make a reliable identification and that they did not need additional input from a heroin user.

Argument of counsel at the close of the hearing brought all of the circumstances considered by the court of appeal to the attention of the juvenile court, including discrepancies in the defense case with respect to where and how defendant spent the afternoon before his arrest and whether defendant did, or (in his opinion) did not resemble anyone else in the Fischer Housing Development. In the end, the juvenile court found Dobard's testimony sufficient to negate any reasonable probability of misidentification and because that credibility determination appears rationally based on the evidence presented at the adjudication hearing, the court's finding forecloses second guessing by an appellate court under the rational fact finder test of *Jackson v. Virginia*. Moreover, even under a broader, civil standard of review, we find no clear or manifest error in the trial court's credibility determination. *See Rosell v. ESCO*, 549 So.2d 840, 844–45 (La.1989) ("When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. . . . [unless] documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story. . . . a factfinder's finding . . . based on its decision to credit the testimony of one of two or more witnesses . . . can virtually never be manifestly erroneous or clearly wrong.") (citing, *inter alia*, *Mussall*); *see also Foley v. Entergy Louisiana, Inc.*, 06-0983, p. 10 (La.11/29/06), 946 So.2d 144, 153 ("If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.") (citation omitted).

18

In *State v. Moser*, 588 So.2d 1243 (La.App. 1 Cir. 1991), *writ denied*, 594 So.2d 1314 (La. 1992), the defendants were convicted of aggravated rape. On appeal, they argued that the evidence was insufficient to prove they penetrated the victim's anus with their penises; rather, they claimed that the evidence established that they inserted a beer bottle into her anus. Accordingly, they contended that their convictions should be reduced to sexual battery. The first circuit affirmed the aggravated rape convictions, finding:

> Defendants' position is based on the following factual allegations. During the offense, the victim was not able to observe what happened behind her, but she felt something which hurt her badly. The victim never saw Moser with an erection; and she was not questioned as to whether or not Page had an erection. No semen was detected during the victim's rape examination, and no fecal matter was detected on defendants' penises during their examinations. The emergency room doctor who examined the victim testified that any object which had been introduced into the victim's anus would have been covered with feces. Significantly, a beer bottle containing human fecal matter was found near the victim's clothing at the scene of the offense.
>
> These allegations, however, are an incomplete review of the evidence introduced in this case. Without reservation, the victim repeatedly testified that the penis of each defendant penetrated her anus during the incident. She persisted in this testimony despite extensive questioning on the point. Even in the absence of scientific evidence of sexual intercourse (such as the finding of sperm in the victim's anus), the testimony of a rape victim alone is sufficient to establish the element of sexual penetration. *See State v. Rives*, 407 So.2d 1195, 1197 (La.1981); *State v. Robinson*, 471 So.2d 1035, 1040 (La.App. 1st Cir.), *writ denied*, 476 So.2d 350 (La.1985). Furthermore, as the doctor noted, the absence of sperm in the victim's anus and the absence of tearing was not unexpected. Although the victim noted that Moser had trouble maintaining an erection during oral sex, she also stated that he inserted his penis into her anus. For sexual intercourse to occur it was not necessary that he ejaculate or have an erection as "any sexual penetration . . . however slight is sufficient to complete the crime." La.R.S. 14:41(B). Additionally, the clear implication from the victim's testimony was that the victim observed Page to have an erection.
>
> Defendants point out that no feces was detected on their bodies as would be expected had their penises been inserted into the victim's anus. However, defendants were arrested in a hotel room and their

medical examinations were conducted several hours after the incident. Despite the delay, fecal matter was found in the genital area on Page's shirt and pants and in a similar location on Moser's shirt. A paper towel containing human excrement was located by a law enforcement officer at the scene of the rape.

This physical evidence, combined with the diagnosis of anal rape issued by the doctor who examined the victim, corroborates the victim's testimony of penile penetration. The victim admitted that it was possible that an object other than the defendants' penises might also have been inserted into her anus, and she testified that during a "portion" of the time when Page was raping her "it hurt very bad." The possibility that the beer bottle also might have been inserted into her anus does not discredit her remaining testimony of anal rape.

Accordingly, we conclude that the evidence was sufficient to establish defendants' guilt beyond a reasonable doubt. Defendants assignment of error is meritless.

*State v. Moser*, 588 So.2d at 1250-51 (footnote omitted).

Finally, in *State v. Williams*, 11-79, p. 7 (La.App. 5 Cir. 11/29/11), 80 So.3d 626, 631, the court stated:

Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. *State v. Chism,* 436 So.2d 464, 469 (La.1983). The trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised, and the weight and effect to be given to each permissible inference. *Id.*

The law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Spears*, 05-0964, p. 3 (La.4/4/06), 929 So.2d 1219, 1222; *State v. Mussall*, 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protections of due process of law. *Spears*, 05-0964 at 3, 929 So.2d at 1222-23.

Although there was no physical evidence to corroborate the victim's testimony in this case, "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact

finder, is sufficient support for a requisite factual conclusion." *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004). We defer to the trier of fact's credibility determination and the reasonable inferences drawn from the evidence presented concerning the use of the Juvenile's "no-no" as opposed to another object and the sensation experienced by the victim being attributable to the use of a lubricant. Based on the foregoing, we find that the evidence was sufficient to prove the Juvenile's guilt beyond a reasonable doubt. Additionally, since there was no evidence presented that contradicted A.M.F.'s story and since the story is not so internally inconsistent on its face that a reasonable fact finder would not credit her story, we find that the judge's finding is not manifestly erroneous, and the conviction is affirmed.

### AGE AT THE TIME OF THE OFFENSE

Although not an element of La.R.S. 14:42, for the court to impose the enhanced disposition provision of La.Ch.Code art. 897.1 and the lifetime sex offender registration, the Juvenile had to be fourteen years or older at the time of the commission of the offense. The Juvenile contends that the State offered very little evidence of any specific time frame. Thus, he contends this court should decline to infer that he committed at least one act of rape beyond his fourteenth birthday as this fact was not proven beyond a reasonable doubt.

The petition alleged that the acts occurred between January 1, 2016, and January 1, 2018. The Juvenile's date of birth is February 25, 2003. Detective James testified that the victim's mother told him that the incidents started in June 2017, which was when C.C.H. was fourteen. Detective James testified that the Juvenile and his brother were sixteen when they were arrested, so they were fourteen to fifteen when the acts occurred.

21

The victim testified that she could not recall the last time she went to Ms. Giarrusso's house; she was asked "[w]ould you say it was this year? Last year?" to which she responded, "[l]ast year," which would have been 2019. Later, when the victim was asked whether this had just happened at Ms. Giarrusso's house, the victim responded, "[n]o ma'am. This happened uh, years ago." She later testified that she was six when the incidents started (which would have been between September 25, 2015, and September 24, 2016), and probably eight when they ended (which would have been until September 24, 2018). A.M.F. testified that the Juvenile and his family moved "I think two (2) years ago or a year ago" (which would have been 2018 or 2019), and she confirmed that she told the interviewer at the Advocacy Center that it occurred between 2016 and 2017. C.C.H. would have been fourteen only after February 25, 2017.

Ms. Eaglin conducted the interview of A.M.F. on December 13, 2019. In the interview, A.M.F. said the last incident happened in 2016 or 2017, and she thought the boys moved to Georgia the previous year, which would have been 2018.[6]

Thus, the only conclusive evidence that established that C.C.H. committed rape of A.M.F. after he was fourteen years old was Detective James' testimony that A.M.F.'s mother told him the incidents started in June 2017.

In *State in the Interest of E.S.*, 18-1783 (La. 10/22/19), 285 So.3d 1046, the supreme court found that the evidence was insufficient to show the juvenile was at least fourteen years of age at the time of the offense, which was required for the

---

[6] In the interview, Ms. Eaglin asked A.M.F. the age of the Juvenile and his twin brother. She said she was not sure at this point, but she thinks they "were" sixteen. (It is not clear whether A.M.F. meant at the time of the interview or the time of the incidents.)

trial court to impose a mandatory disposition of secure placement until age twenty-one and lifetime sex offender registration.  In so finding, the court stated:

> Although the parties appear to be in agreement concerning the State's burden of proof with respect to the juvenile's age – that the State was required to prove such a fact beyond a reasonable doubt, and that this Court will review a finding of guilt under the *Jackson* standard for sufficiency of the evidence – this Court has yet to opine as to the applicable burden of proof and corresponding standard of review on appeal for the element of age under Ch. C. art. 897.1 and R.S. 15:542.
>
> Given the *de minimus* evidence presented, however, we find the State failed to meet its burden under *any* standard of review to prove that the district court reasonably found that E.S. was fourteen years old when he raped N.H. The record is completely devoid of any concrete evidence establishing when the abuse happened except that it clearly occurred before February 2017 when N.H. made the initial disclosure.  The State did present evidence, based on the testimony of M.S. and the victim's grandmother, that N.H. visited E.S.'s house after E.S. had turned fourteen years old. However, the State produced no evidence as to *when* the abuse occurred. N.H. did not testify as to any specific dates or give any information that would identify a season or holiday, let alone a specific date, on which the abuse occurred. Likewise, she was never asked whether the abuse occurred every time she visited E.S.'s home. Though the victim first reported the abuse to her grandfather in February 2017, there was no attempt to establish how recently the abuse had occurred.
>
> To be clear, as discussed in depth above, the record supports a finding that E.S. abused N.H. and did so at least once. Thus, the evidence supports two general conclusions: (1) E.S. raped N.H. at least on one occasion; and (2) N.H. visited E.S.'s home after he turned fourteen years old. Making the quantum leap from those two conclusions, however, to infer a third conclusion that E.S. must have therefore committed at least one act of rape beyond his fourteenth birthday is not supported by the record. As such, we find the State has failed to present sufficient evidence that E.S. was fourteen years of age at the time of the offense. Having thus concluded that lifetime sex offender registration pursuant to R.S. 15:542 is inapplicable to this case, we are unable to reach the constitutional issue for which we granted the juvenile's writ.

*Id.* at 1060-61.

The supreme court found there was insufficient evidence to support the finding that E.S. was fourteen at the time of the offense.  Accordingly, the court

affirmed the delinquency adjudication but reversed the court of appeal's finding that there was sufficient evidence to establish E.S.'s age at the time of the offense. The disposition was vacated, and the case was remanded for redisposition.

We find that Detective James' testimony that A.M.F.'s mother told him the incidents started in June 2017, as unobjected to hearsay, became substantive evidence. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied*, 15-1151 (La. 5/13/16), 191 So.3d 1054; *State v. Howard*, 04-499 (La.App. 3 Cir. 11/17/04), 888 So.2d 375, *writ denied*, 04-3216 (La. 4/8/05), 899 So.2d 13. Thus, there was sufficient evidence to establish that C.C.H. was fourteen at the time of the offense; however, as will be discussed below, we find that the Juvenile's claim that trial counsel was ineffective in failing to object to this testimony as hearsay has merit.

## ASSIGNMENT OF ERROR NUMBER SIX

We will address this assignment out of order as it addresses an issue raised in Assignment of Error Number One. The Juvenile contends that trial counsel was ineffective in failing to object to Detective James' hearsay testimony offered at the adjudication hearing and in failing to object to the immediate disposition proceeding.

The Juvenile argues that Detective James' testimony that A.M.F.'s mother told him that the incidents in question began in June 2017 was hearsay. The declarant did not testify at trial, and this date conflicted with the date range provided by A.M.F. in her interview - that the last incident was between 2016 and 2017. Further, she did not indicate which of the twins committed the last offense.

A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80

24

L.Ed.2d 674 (1984). To establish his attorney was ineffective, defendant must first show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. *Strickland, supra.* The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Cambre,* 05–888 (La.App. 5 Cir. 7/25/06), 939 So.2d 446, 460, *writ denied,* 06–2121 (La.4/20/07), 954 So.2d 158.

Second, defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial which result is reliable. The defendant must show actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland, supra.*

*State in the Interest of S.L.*, 11-883, pp. 16-17 (La.App. 5 Cir. 4/24/12), 94 So.3d 822, 835.

In *S.L.*, the court also discussed a reversible hearsay issue:

Defendant next argues that the only evidence of his identity as the perpetrator of the simple burglary was the description offered by the police dispatch, which he contends is inadmissible hearsay. He further asserts the admission of the hearsay evidence was not harmless because it was the only evidence establishing his identity as the perpetrator and the use of it violated his constitutional right to confront his accusers.

The State responds that the information in the police dispatch was properly admitted to prove the course and conduct of the police investigation which led to S.L.'s arrest. The State further asserts defendant's right to confrontation was not violated because a police dispatch is not testimonial.

Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay

25

evidence is inadmissible except as specified in the Louisiana Code of Evidence or other legislation. La.C.E.art. 802. Such evidence is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. *State v. Smith,* 03–866 (La.App. 5 Cir. 11/25/03), 862 So.2d 240, 244, *writ denied,* 04–0050 (La.5/7/04), 872 So.2d 1078.

Police officers may refer to statements made to them by other persons involved in the case in order to explain their actions. *State v. Watson,* 449 So.2d 1321, 1328 (La.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); *State v. Ballay,* 99–906 (La.App. 5 Cir. 2/29/00), 757 So.2d 115, 127, *writ denied,* 00–908 (La.4/20/01), 790 So.2d 13. Such statements are admissible not to prove the truth of the statement being made, but rather are offered to explain the sequence of events leading to the arrest of the defendant and, as such, are not hearsay. *State v. Calloway,* 324 So.2d 801, 809 (La.1975).

In *State v. Broadway,* 96–2659 (La.10/19/99), 753 So.2d 801, 808, *cert. denied,* 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court commented on the admissibility of information received by a police officer:

> Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer's presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. *McCormick on Evidence* § 249 (E. Cleary 3d ed.1984). Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. *Id.* The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, *Louisiana Evidence Law* 429–431 (1974).

> When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement

should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.

The police dispatcher's physical descriptions of the juvenile suspects were not needed to show why the officers reported to the area of the burglary. The officers' testimony was used to show not only why the officers acted as they did, but also to prove identity of the perpetrators. When Sgt. Arnold spotted S.L. riding his bike towards the eastbound ramp of I–10, he recognized that S.L. fit the description he had heard over the police radio. When the officers apprehended S.L. in the parking lot of the Susan Park playground, they did so because S.L. met the clothing description relayed by the police dispatcher who had obtained the description of the suspects from an unidentified source.

In *State v. Arbuthnot,* 367 So.2d 296 (La.1979), the Louisiana Supreme Court reversed a defendant's conviction on the basis of a police officer's hearsay testimony regarding a non-testifying witness' positive identification of the defendant. Although another eyewitness identified the defendant, the supreme court reasoned that the hearsay description of the non-testifying witness improperly bolstered the State's identification testimony by its only identification witness. *Id.* at 298–99.

In this case, both Officer Matise and Sgt. Arnold were notified of the offense and the suspects' descriptions by a police dispatcher, who received the information from an unidentified caller. Other than the police officers who responded to the dispatch call, Mr. Franklin, the victim of the simple burglary, was the only other witness to testify and his testimony was very limited. He did not testify that he observed the individuals who burglarized his car, and he did not testify that he provided a description of the suspects to the police. Further, Mr. Franklin did not make an in-court, or out-of-court, identification of S.L. as the individual who burglarized his car. The State called no other witnesses to explain the origin of the police transmission or to identify S.L. as the perpetrator.

The erroneous admission of hearsay testimony is subject to a harmless error analysis. *State v. Wille,* 559 So.2d 1321, 1332 (La.1990); *State v. Davis,* 06–402 (La.App. 5 Cir. 11/28/06), 947 So.2d 48, 57, *writ denied,* 07–0003 (La.9/14/07), 963 So.2d 996. The proper inquiry is whether the guilty verdict rendered was surely unattributable to the error. Factors to be considered in making this determination include: (1) the importance of the witness' testimony;

27

(2) the cumulative nature of the testimony; (3) the existence of corroborating or contradictory evidence regarding the major points of the testimony; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case. *Id.* at 57.

We cannot say the erroneous admission of hearsay evidence was harmless error in this case. The State's case against defendant was circumstantial. The physical description given by an unknown person to the police dispatcher was clearly used to link S.L., who was not in possession of any stolen goods at the time of his arrest, to the burglary of Mr. Franklin's car. Accordingly, we find the erroneous admission of the police dispatch regarding the physical description of the perpetrators was not harmless because it was used to directly link defendant to the crime. As such, defendant is entitled to a new trial on the charge of simple burglary.

*Id.* at 832-34 (footnotes omitted).

We find that the Juvenile's ineffective assistance of counsel claim can be resolved on the record before this court, and it has merit. The only evidence that clearly established that the Juvenile was fourteen years of age at the time of the commission of the offense was Detective James' hearsay testimony. Although police officers may refer to statements made to them by other persons involved in the case in order to explain their actions, that was not the purpose for which the information was used in this case. It was used to establish the Juvenile's age as fourteen (or over) at the time of the commission of the offense. Counsel erred in failing to object to this hearsay testimony, and the Juvenile was prejudiced in that a harsher penalty was imposed on him because of the failure to object. Therefore, the trial court's finding that there was sufficient evidence to establish C.C.H. was fourteen years of age at the time of the offense is reversed and remanded for disposition accordingly.

Next, the Juvenile contends counsel was ineffective in failing to object to the immediate summary disposition hearing, preventing him from filing a motion to vacate the adjudication or prepare for a hearing at which evidence could have been

28

presented about the date of the offense and C.C.H.'s age. We find that this issue is moot based on our previous ruling.

## ASSIGNMENT OF ERROR NUMBER TWO

The Juvenile contends the judge erred in failing to impose a disposition in this case which requires the case be remanded for a new disposition hearing and for the imposition of a disposition. Following the adjudication, the judge stated:

> Children's Code Article 897.1 indicates that after an adjudication for a felony grade delinquent act based upon a violation of Revised Statute 14:42, First Degree Rape, the Court shall commit the child who is fourteen (14) years or older at the time of the commission of the offense, to the custody of Department of Corrections to be confined and secure placement until the child obtains the age of twenty-one without benefit of probation or suspension of sentence or suspension of imposition or execution of sentence.
>
> Um, therefore, the statute mandates a specific period of custody. Mr. Smith did also reference that the fact that you'll be required to register as a sex offender. Upon your release from the State's custody, that notification is set forth in Children's Code Article 884.1.
>
> The Court is going to provide you with a copy of that article so that you can be sure that you are familiar with your requirements to register, and also so that you can insure compliance with it because when you are released, you will be an adult, and violations of that registration requirement uh, carry a minimum sentence of two (2) years at hard labor, and therefore, it is very important that you comply with those requirements.

Counsel contends that, although it is obvious what the judge intended to impose as the disposition, he did not actually order that the mandatory disposition be imposed. We find that this claim has merit. In *State v. Charles*, 19-745, pp. 3-4 (La.App. 3 Cir. 6/24/20), 299 So.3d 688, 690-91, this court held:

> Defendant contends the trial court erred by failing to impose a sentence on either count; thus, the sentences must be vacated, and the case remanded for resentencing. In particular, Defendant contends the trial court failed to actually impose a sentence for the first-degree rape conviction and failed to clearly state how much time was to be served without benefits for the second-degree kidnapping conviction. In its

29

brief, the State acknowledges that the trial court failed to impose a sentence for the first-degree rape conviction.

At sentencing, the trial court stated the following:

THE COURT:

Thank you. Let the defendant rise. Let the record reflect the Court, as Defense Counsel suggested, is mandated under Louisiana law, under Louisiana R.S. 14:42, First-Degree Rape:

"Whoever commits the crime of first-degree rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."

Again, as the defendant has learned through this trial, Mr. Charles, that Louisiana law is a solemn expression of legislative will. So, this Court is mandated under law that, if a jury of your peers or a jury chosen by the State and by counsel, has made a decision, they have decided your fate under Louisiana law.

As it relates to the second charge conviction - - that's 14:44.1, Second Degree Kidnapping, the statute reads in pertinent part:

"Whoever commits the crime of second-degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence."

The Court, having considered the matter and having followed the lead in this conviction by a jury of your peers, the Court is going to sentence Mr. Orlando Charles to 25 years at hard labor, and that sentence shall run concurrent with the life sentence imposed for first-degree rape.

This court agrees with Defendant and the State that the trial court failed to impose a sentence for first-degree rape. Thus, we remand for the trial court to impose a sentence for first-degree rape. *See, e.g., State v. Coward*, 18-951 (La.App. 3 Cir. 6/5/19) (unpublished opinion) (2019 WL 2366740). The trial court is reminded that the sentencing guidelines of La.Code Crim.P. art. 894.1 should be articulated and that if a downward departure from the mandatory life sentence is argued by Defendant, it should make such findings as may be warranted by the law and evidence. *See id.*

30

The Juvenile is correct in his assertion that the disposition was not actually imposed. Accordingly, this case must be remanded for the imposition of disposition.

Counsel additionally requests that this court order the trial court to amend the court minutes of the disposition to reflect that a disposition was not imposed and either amend or withdraw the December 3, 2020 custody order. Although the holding of a new disposition hearing will result in a new minute entry and custody order which will supersede the court minutes and custody order, out of an abundance of caution, we order the trial court to amend the court minutes of the disposition to reflect that a disposition was not imposed and that the December 3, 2020 custody order is withdrawn.

Additionally, we advise that when a disposition is imposed, a separate disposition must be imposed for each of the Juveniles. This court requires a separate disposition for each adjudication where a juvenile commits multiple offenses. *State ex rel. S.C.J.*, 09-1272 (La.App. 3 Cir. 2/3/10), 28 So.3d 1206, *writ denied*, 10-496 (La. 4/5/10), 31 So.3d 363.

### ASSIGNMENT OF ERROR NUMBER THREE

The Juvenile contends the trial court judge violated his due process rights in ordering the disposition be held immediately following the adjudication hearing and in failing to hold a full disposition hearing without a waiver by the Juvenile.

Louisiana Children's Code Article 892 requires the court to conduct a disposition hearing prior to entering a judgment of disposition. This hearing may be conducted immediately after the adjudication but must be conducted within thirty days after the adjudication unless the period is extended for good cause. Article 893(A) requires the court to hear evidence at the disposition hearing as to

31

whether the child needs treatment or rehabilitation unless the child waives the presentation. A failure to object does not serve as a waiver. *State in the Interest of T.W.*, 09-532 (La.App. 3 Cir. 10/7/09), 21 So.3d 465; *State in the Interest of K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716; *State in the Interest of O.R.*, 96-890 (La.App. 5 Cir. 2/25/97), 690 So.2d 200.

There was no waiver of the hearing in this case. Although the disposition was mandatory, the Juvenile notes that a downward departure may be a possibility under *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So.2d 672. Therefore, upon remand for the imposition of disposition, in the absence of a clear waiver, a disposition hearing should be held.

## ASSIGNMENT OF ERROR NUMBER FOUR

The Juvenile contends that should this court find that a disposition hearing was properly held, and a disposition indeed imposed, the trial judge erred in signing the custody order which included his age at the time of the commission of the offense, a finding not articulated by the judge at the adjudication proceedings. In addition, the custody order indicated there was a limitation on parole which was not imposed at the disposition hearing nor permitted by law. We find this assignment of error is moot in light of our previous ruling in this opinion.

## ASSIGNMENT OF ERROR NUMBER FIVE

In this assignment of error, the Juvenile contends the trial court failed to advise him of the two-year period for filing an application for post-conviction relief and failed to give him credit for time served. We find this assignment has merit.

Louisiana Code of Criminal Procedure Article 930.8 requires the trial court to inform a defendant at sentencing that he has two years from the finality of his

conviction and sentence to file an application for post-conviction relief. Although the Louisiana Children's Code contains no similar provision, this court has required this notice be given to juveniles. *See State in the Interest of J.J.M.*, 16-347 (La.App. 3 Cir. 11/9/16), 207 So.3d 609; *State in Interest of C.C.*, 13-417 (La.App. 3 Cir. 10/9/13), 124 So.3d 56. Thus, we order the trial court to advise the Juvenile of the time limitation for filing an application for post-conviction relief at the imposition of disposition.

Next, La.Ch.Code art. 898(A) requires the court to "give a child credit for time spent in secure detention prior to the imposition of disposition." As such, the trial court is instructed to comply with La.Ch.Code art. 898(A) upon entering a disposition on remand.

## DECREE

The trial court's ruling that C.C.H. committed the first degree rape of A.M.F. is affirmed. The trial court's finding that C.C.H. was fourteen or older at the time of the commission of the offense is reversed. The case is remanded to the trial court for the imposition of a disposition, and in the absence of a clear waiver, a disposition hearing should be held. After disposition is imposed, the Juvenile must be given credit for time served in accordance with La.Ch.Code art. 898(A) and be advised of the time limitations for filing an application for post-conviction relief pursuant to La.Code Crim.P. art. 930.8. We further order the trial court to amend the court minutes of the December 2, 2020 disposition to reflect that a disposition was not imposed and to withdraw the December 3, 2020 custody order.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.**

33